**ALMEIDA LAW GROUP LLC**
Matthew J. Langley (SBN 342846)
matt@almeidalawgroup.com
849 W. Webster Avenue
Chicago, IL 60614
(773) 554-9354
matt@almeidalawgroup.com

**AHMAD, ZAVITSANOS, & MENSING, PLLC**
Foster C. Johnson (SBN 289055)
fjohnson@azalaw.com
1221 McKinney Street, Suite 2500
Houston, TX 77010
(713) 655-1101

[additional Counsel listed below]

*Attorneys for Plaintiffs & the Putative Classes*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| JANE DOE, JANET DOE, JOHN DOE, JANICE DOE, JAMIE DOE, JASMINE DOE, and JULIA DOE, *individually and on behalf of all others similarly situated*,<br><br>Plaintiffs,<br><br>vs.<br><br>EXPERITY, INC. d/b/a CLOCKWISE MD AND ACCESS CLINICAL PARTNERS, LLC d/b/a GOHEALTH URGENT CARE,<br><br>Defendants. | Case No. 3:26-cv-02667<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs Jane Doe, Janet Doe, John Doe, Janice Doe, Jamie Doe, Jasmine Doe, and Julia Doe ("Plaintiffs"), on behalf of themselves and all others similarly situated patients (collectively "Plaintiffs"), upon personal knowledge as to Plaintiffs' own conduct and upon information and belief as to all other matters based upon investigation of counsel, such that each allegation has evidentiary support or is likely to have evidentiary support upon further investigation and discovery, and for their Class Action Complaint against Defendants Experity, Inc. d/b/a Clockwise MD ("Experity") and Access Clinical Partners, LLC d/b/a GoHealth Urgent Care ("GoHealth," together with Experity, "Defendants"), state as follows:

## NATURE OF THE ACTION

1. Experity offers an online appointment software platform to its health care provider clients, including Defendant GoHealth and others (like Hoag Health), across the United States via its "Clockwise MD" branded websites and appointment booking technology.

2. Plaintiffs, individually and on behalf of all members of the proposed class (the "Class Members") bring this action against Experity and GoHealth for surreptitiously divulging their health information to Google and other third-party marketing and advertising companies (collectively, the "Third Parties") via online tracking technologies (the "Tracking Technologies") when these patients booked appointments via the appointment-scheduling web functionality provided by Experity via its Clockwise MD branded websites and technology (collectively, the "Appointment Making Services" or "Clockwise MD") through the GoHealth website (https://www.gohealthuc.com/).

3. During the Class Period, every time that patients, including Plaintiffs and other Class Members, made online appointments with their doctors using the Clockwise MD technology, Experity and GoHealth shared (1) that patients had made an appointment, (2) the time and date they made the appointment, (3) their patient status, (4) the healthcare provider they made the appointment with, and (4) a trove of personally identifying information ("PII"), which allowed the Third Parties, including companies like Google, to specifically identify patients' real world identities and then exploit their health information for advertising purposes.

4. Defendants did all this without patients' knowledge, authorization, or consent.

5. GoHealth is an urgent care healthcare provider, and a covered entity under HIPAA, that owns and operates clinics nationwide, including in Northern California. GoHealth controls and maintains the website https://www.gohealthuc.com/ and its webpages (the "Website"), through which it encourages its patients to book appointments and provide communications regarding their personal health information.

6. Experity is one of the largest providers of health information technology services in the United States, providing its Clockwise MD Appointment Making Services to hundreds of health care providers, including GoHealth, and millions of patients. Experity hosts its online Appointment Making Services for healthcare providers across the country, which allow patients to manage their healthcare online by searching for physicians and scheduling appointments.

7. By providing Appointment Making Services for health care providers, Experity operates as a "business associate" under HIPAA, which requires Experity to maintain patients' Protected Health Information (or "PHI") in a manner consistent with HIPAA regulations.[1] In addition to HIPAA, Experity is obligated to maintain the confidentiality of Protected Health Information under state and federal law.

8. Despite these obligations, and unbeknownst to patients, Experity deployed third-party Tracking Technologies, including Google digital marketing and automatic rerouting tools, on its online Appointment Making Services websites. Via these tools, Experity purposefully and intentionally disclosed patients' Protected Health Information to Third Parties who exploited the information and used it for its own economic benefit. By using these tools, Experity took patients'

---

[1] Under HIPAA, "Protected Health Information" means "individually identifiable health information: (1) Except as provided in paragraph (2) of this definition, that is: (i) Transmitted by electronic media; (ii) Maintained in electronic media; or (iii) Transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103. HIPAA defines "Individually Identifiable Health Information" as "information that is a subset of health information, including demographic information collected from an individual, and: (1) Is created or received by a health care provider, health plan, employer, or health care clearinghouse; and (2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and (i) That identifies the individual; or (ii) With respect to which there is a reasonable basis to believe the information can be used to identify the individual."

confidential communications and PHI and automatically sent them to Google and other Third Parties—an unambiguous violation of patients' reasonable expectations of privacy, their rights as patients, and their rights under federal and state law. Experity did all this knowing it constituted a violation of HIPAA and state law, for the purpose of reaping the illicit financial gains from its criminal and tortious disclosures of patients' PHI.

9. In addition to installing and configuring its own Tracking Technology, Experity also encouraged and aided the use of Tracking Technology by its health care clients, including GoHealth, on the Clockwise MD Appointment Making Services by installing and configuring Google Analytics tracking pixels and other Tracking Technologies to intercept, disclose, and exploit patients' PHI, including appointment information, with Google and other third parties.

10. For example, Unbeknownst to patients, GoHealth deployed its own third-party Tracking Technologies, including Google digital marketing and automatic rerouting tools, on Experity's online Appointment Making Services websites. Via these tools, GoHealth purposefully and intentionally disclosed patients' PHI to Third Parties including Google.

11. Experity's conduct in deploying surrepsitous Tracking Technologies on its appointment making websites violates reasonable expectations of patient privacy. Experity did not provide patients with any warnings that using its Appointment Making Services would result in Experity divulging their PHI, PII, and the substance of their communications to Third Parties.

12. There is no dispute that Defendants' conduct is unlawful. In December 2022, the Office of Civil Rights at the United States Department of Health and Human Services ("HHS") issued a bulletin (the "Bulletin") reminding both covered entities and business associates alike of their patient privacy obligations "when using online tracking technologies."[2] HHS further clarified that health information cannot be shared with "tracking technology vendors" unless they have signed a "business associate agreement (BAA)" to ensure that health information is "protected in accordance with HIPAA."[3]

---

[2] *See* Office for Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.
[3] *Id.*

13. Similarly, Google warns entities like Defendants who provide healthcare-related services that Google Analytics should not be deployed on websites like Experity's Clockwise MD sites or "in any way that implicates Google's access to, or collection of, PHI," expressly warning that entities such as Experity "must refrain from exposing to Google any data that may be considered Protected Health Information" and "may only use Google Analytics on pages that are not HIPAA-covered":[4]

> **Can Google Analytics be used in compliance with HIPAA?**
>
> Customers must refrain from using Google Analytics in any way that may create obligations under HIPAA for Google. HIPAA-regulated entities using Google Analytics must refrain from exposing to Google any data that may be considered Protected Health Information (PHI), even if not expressly described as PII in Google's contracts and policies. Google makes no representations that Google Analytics satisfies HIPAA requirements and does not offer Business Associate Agreements in connection with this service.
>
> For HIPAA-regulated entities looking to determine how to configure Google Analytics on their properties, the HHS bulletin provides specific guidance on when data may and may not qualify as PHI. Here are some additional steps you should take to ensure your use of Google Analytics is permissible:
>
> - Customers who are subject to HIPAA must not use Google Analytics in any way that implicates Google's access to, or collection of, PHI, and may only use Google Analytics on pages that are not HIPAA-covered.
> - Authenticated pages are likely to be HIPAA-covered and customers should not set Google Analytics tags on those pages.
> - Unauthenticated pages that are related to the provision of health care services, including as described in the HHS bulletin, are more likely to be HIPAA-covered, and customers should not set Google Analytics tags on HIPAA-covered pages..
> - Please work with your legal team to identify pages on your site that do not relate to the provision of health care services, so that your configuration of Google Analytics does not result in the collection of PHI.

14. Despite Plaintiffs' and Class Members' reasonable expectations that Defendants would not share their PHI and PII (together, "Sensitive Health Information") with Google and other third parties via the use of marketing tools, Defendants routinely divulged patients' information anyway.

15. Defendants did so through a multi-step process.

a. Experity required patients to have first-party cookies enabled to access its Appointment Making Services. This includes all pages available before a patient signs in as well as within the "authenticated" portions of the website. Without first party cookies, the site does not load normally and instead diverts to a captcha verification page that repeatedly reloads, preventing access. In other

[4] https://support.google.com/analytics/answer/13297105?hl=en

words, first-party cookies are a prerequisite for basic access and navigation across the site as well as for authenticated session management.

b. Experity placed, enabled, and aided the placement of Google source code, on its Appointment Making Services.

c. When a patient visited Experity's Appointment Making Services, the Google source code that Experity deployed for itself, and aided in deploying for its health care provider clients, including GoHealth, caused Google identifiers to be ghostwritten onto a patient's communications device as "first-party" cookies belonging to Experity. By using first-party Google cookies, Experity prevented patients from blocking the deposit of the Google cookies through the use of third-party cookie blockers. In addition, because Experity required the use of first-party cookies to access the website, Experity made certain that all patients who used its Appointment Making Services would have the Google cookies placed on their device.

d. The Tracking Technology that Experity deployed in its Appointment Making Services, and aided its health care provider clients, including GoHealth, in deploying and configuring, both captured patients' communications and commanded patients' computing devices to re-direct and divulge patient and device identifiers and the content of patient communications to Third Parties via their various marketing services.

e. Experity, GoHealth, and the Third Parties used this information for marketing purposes.

16. Defendants did not make any attempt to obtain Plaintiffs' or Class Members' consent before sharing patients' protected Sensitive Health Information with Third Parties, nor do Defendants have express written consent from any Plaintiff or Class Member to share their Sensitive Health Information with Third Parties.

17. Defendants' unauthorized disclosures violate both state and federal law. Moreover, through its unauthorized disclosures, Defendants breached their fiduciary duties, was unjustly

enriched, and committed multiple torts and crimes, including criminal violations of the Electronic Communications Privacy Act ("ECPA"). As courts have found across the country, violating these privacy rights harms patients, as it misappropriates their rights to control how information about them is distributed and exploits the value their health data in the marketplace. *Doe v. Virginia Mason Medical Center*, 2024 WL 3517759 (Wash. Super.) ("If it did not have value, then entire industries that sell and trade this data would not exist.").

18. Defendants intentionally intercepted, endeavored to intercept, and, in the case of Experity, aided its healthcare provider clients in intercepting Plaintiffs' and Class Members' electronic communications through the deployment and configuration of Tracking Technologies on its Appointment Making Services, in violation of ECPA.

19. Defendants' conduct caused damage to Plaintiffs and Class Members:

a. Sensitive and confidential Sensitive Health Information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the provider-patient relationship;

c. Plaintiff and Class Members cannot remediate the privacy harms they have suffered without expending many hours and spending hundreds of dollars a year to pay for third-party services to scrub their Sensitive Health Information from data broker rolls;

d. Defendants took something of value (*i.e.*, personal and private Sensitive Health Information and other personal data), from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' or Class Members' knowledge, informed consent, or authorization, and without sharing the benefit derived; and

e. Defendants' actions diminished the value of Plaintiffs' and Class Members' Sensitive Health Information and other personal data.

## PARTIES

20. Plaintiff Jane Doe is a resident of Orange County, California, who has made multiple urgent care appointments via the Experity Appointment Making Services, including urgent care appointments at Hoag Urgent Care Aliso Viejo and Hoag Memorial Hospital Irvine Emergency Center. Plaintiff Jane Doe used the Experity Appointment Making Services in connection with emergency medical care that she received from Hoag Health in California for Covid-19, heart health issues, and flu-like symptoms.

21. Plaintiff Janet Doe is a resident of Orange County, California, who has made urgent care appointments via the Experity Appointment Making Services, including urgent care appointments with Hoag Urgent Care Aliso Viejo for acute hip and leg pain.

22. Plaintiff John Doe is a resident of Orange County, California, who has made urgent care appointments via the Experity Appointment Making Services, including urgent care appointments with Hoag Urgent Care Huntington Harbor for bronchitis, eye and ear infections, and breathing issues.

23. Plaintiff Janice Doe is a resident of San Francisco County, California, who has made urgent care appointments via the Experity Appointment Making Services, including urgent care appointments with a GoHealth urgent care facility in San Francisco, California, for COVID testing.

24. Plaintiff Jamie Doe is a resident of Alameda County, California, who has made urgent care appointments via the Experity Appointment Making Services, including urgent care appointments with a GoHealth urgent care facility in Oakland, California, for X-rays, MRIs, and other treatments for her orthopedic treatments.

25. Plaintiff Jasmine Doe is a citizen of Illinois, who has made urgent care appointments via the Experity Appointment Making Services, including urgent care appointemnts at Midwest Express Clinic in Evergreen Park, Illinois.

26. Plaintiff Julia Doe is a citizen of Illinois, who has made urgent care appointments via the Experity Appointment Making Services, including urgent care appointments at Midwest Express Clinic in Evergreen Park, Illinois.

27. Defendant Experity, Inc. ("Experity") is an Illinois corporation with its principal place of business located at 8777 Velocity Drive, Machesney Park, Illinois 61115. Experity provides Appointment Making Services via its Clockwise MD platform for healthcare providers nationwide, including Hoag Health in California, and GoHealth also in California. Via this technology, Experity facilitates millions of unique patient communications each year with patients' healthcare providers.

28. Access Clinical Partners, LLC d/b/a GoHealth Urgent Care ("GoHealth") is a Delaware limited liability company with its principal place of business located at 5555 Glenridge Con Ste 700, Atlanta, Georgia 30342. GoHealth operates at least eleven urgent care clinics throughout Northern California, including multiple locations in San Fracisco, California.

**JURISDICTION AND VENUE**

29. This Court has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332, because: (a) this is a proposed class action in which there are at least 100 Class Members; (b) the parties are minimally diverse, as at least one member of the proposed Class is domiciled in a different state than at least one Defendant; and (c) the combined claims of Class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs.

30. This Court has federal question jurisdiction pursuant to 29 U.S.C. § 1331 because this complaint alleges violation of federal laws and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the remaining state common-law and statutory claims as these state law claims are part of the same case or controversy as the federal statutory claim over which the Court has original jurisdiction.

31. This Court has personal jurisdiction over Defendants because Defendants have sufficient minimum contacts with this District in that they operate and market their services throughout this District, including six different GoHealth Urgent Care clinic in San Francisco, located variously at 2288 Market Street, San Francisco, CA 94114, 930 Cole Street, Suite #102, San Francisco, CA 94117, 2895 Diamond Street, San Francisco, CA 94131, 2395 Lombard Street, San Francisco, CA 94123, 199 West Portal Avenue, San Francisco, CA 94127, 170 Columbus Avenue, Suite 110, San Francisco, CA 94133 and a seventh Urgent Care located at 3900 Piedmont

Avenue, Oakland, CA 94611, each of which has offered online appointment making via Experity's ClockWise MD technology.

32. Additionally, Defendants are subject to specific personal jurisdiction in this State because (1) a substantial part of the events and conduct giving rise to Plaintiffs' and Class Members' claims occurred in this State; (2) both Experity and GoHealth purposely directed their activities towards citizens of the state of California and purposely availed themselves of the privilege of conducting activities within the state of California, thereby invoking the benefits and protections of California law; (3) Plaintiffs' and the Class Members' claims both arise out of and relate to Experity and GoHealth's-related activities; and (4) the exercise of this Court's jurisdiction comports with fair play and substantial justice.

33. Venue is also appropriate in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, including appointments that Jamie Doe and Janice Doe made to see GoHealth urgent care providers in San Francisco and Oakland.

34. Intra-District Assignment: Venue is also appropriate in this District because a substantial part of the events and omissions giving rise to the violations of law alleged herein occurred in the County of San Francisco, and as such, this action may be properly assigned to the San Francisco division of this Court pursuant to Civil Local Rule 3-2(c).

## FACTUAL BACKGROUND

### A. Defendants Systematically and Routinely Disclosed Patients' Protected Health Information to Third Parties, including Google.

35. Plaintiffs and Class Members are patients who have used the Experity Appointment Making Services.

36. Healthcare providers like GoHealth and their Business Associates like Experity have fiduciary, common law, and statuory duties to protect the confidentiality of patients PHI and to refrain from making unauthorized disclosures of patients' Sensitive Health Information.

//

//

37. Medical patients like Plaintiffs and Class Members have a legal interest in preserving the confidentiality of their communications with healthcare providers and their Sensitive Health Information, including their PHI.

38. Patients also have reasonable expectations of privacy that their Sensitive Health Information will not be disclosed to third parties without their express written consent and authorization.

39. Experity operates the Appointment Making Services, including Clockwise MD, for hundreds of healthcare providers and health care systems across the United States, including GoHealth and Hoag Health in California.

40. Defendants encourage patients to use the digital tools on the Appointment Making Services to seek and receive health care services.

41. Experity's Appointment Making Services are designed for interactive communication with patients, including searching for physicians, scheduling appointments, and exchanging communications with providers.

42. Source code that Experity installed and configured on its Appointment Making Services causes these communications to be intercepted and disclosed to Google and other Third Parties.

43. In addition to installing its own Tracking Technology, Experity also aids its healthcare clients, including GoHealth, in deploying and configuring their own surreptitious Tracking Technologies, such as the Facebook Meta Pixel, Google Analytics, and Google Double Click, on Experity's Appointment Making Services.

44. Notwithstanding patients' reasonable expectations of privacy and Defendants' legal duties, Defendants systematically and routinely disclosed patients' Protected Health Information, including the contents of patients' communications with their healthcare providers, via automatic data collection mechanisms it embedded in the Appointment Making Services. Each time that Plaintiffs and Class Members began the appointment making process, the contents of their communications were shared in real-time with Google, New Relic, and other third parties via

Tracking Technologies that Experity and its clients had deployed on the Appointment Making Services.

45. Defendants did this without Plaintiffs' or other patients' knowledge, authorization, or consent. In doing so, Defendants continuously and systematically violated the medical privacy rights of Plaintiffs and Class Members by causing the unauthorized disclosure of their communications to Third Parties including Google.

46. Experity actively encouraged its healthcare clients, including GoHealth, to deploy their own Google Analytics and other Tracking Technologies on the Experity Appointment Making Services, with the result that a patient who used Experity's Appointment Making Services had their patient status and other PHI shared multiple times– both through the Tracking Technology Experity installed and configured for its own use and through the Tracking Technology installed and configured for its health care clients, including GoHealth.

47. With Experity's assistance and encouragement, GoHealth deployed its own Tracking Technologies on the Appointment Making Services offered for its urgent care clinics, including Google Analytics. These Tracking Technologies were in addition to the Tracking Technologies that Experity deployed on the same appointment making websites for GoHealth urgent care centers.

48. Experity intentionally incorporated numerous Tracking Technologies into its Appointment Making Services and never disclosed to Plaintiffs and Class Members that it shared their PHI with Google and other Third Parties, including New Relic. Nor did Experity inform patients that it was permitting Google, New Relic,[5] and other Third Parties to exploit their PHI for marketing purposes. As a result, Plaintiffs and Class Members were unaware that their PHI was being surreptitiously transmitted to Google, Facebook, and other Third Parties when they visited Experity's Appointment Making Services.

49. The Tracking Technologies that Experity deployed on its Appointment Making Services are—by design—invisible to patients. Once integrated into a website, the Tracking

[5] New Relic is a monitoring technology that captures user interactions and performance data from websites and transmits the data to New Relic's analytics platform.

Technology source code is executed in the background, meaning that they operate without ever alerting website users of their presence. Further, because of how these tools are designed, they are able to collect, store, and transmit user data in ways that cannot be blocked by "ad blocker" software or by a user refusing to give their consent to data being collected. By using data collected by Tracking Technologies, Third Parties are able to connect a website user's data to their real-world identity by linking their data to profiles maintained by the Third Parties. For example, this data allowed Google to connect every patient with their Google user accounts.

50. Once Third Parties connect a user's data to their real-world identity, they process, analyze, and assimilate that data so that it can be sold to online advertisers and funneled back to clients like Defendants in the form of aggregated analytics data.

51. Online advertisers—taking advantage of Google's and other Third Parties' troves of personally identifying data—are able to create marketing campaigns that target their advertisements towards specific users, such as Plaintiffs and Class Members.

52. Upon information and belief, Experity and GoHealth intercepted and disclosed at least the following PHI to Third Parties including Google and New Relic:

a. Plaintiffs' and Class Members' status as patients;

b. Plaintiffs' and Class Members' use of Experity's Appointment Making Services;

c. Plaintiffs' and Class Members' appointment scheduling;

d. The names of Plaintiffs' and Class Members' physicians;

e. Information related to Plaintiffs' and Class Members' requests for, receipt of, and communications regarding medical treatment, including their appointment information.

53. Defendants breached their obligations to patients in multiple ways, including (1) failing to obtain patients' consent to disclose their PHI to Third Parties, (2) failing to adequately review its marketing programs and web-based technology to ensure its Appointment Making Services were safe and secure, (3) failing to remove or disengage software code that was known and designed to share Plaintiffs' and Class Members' PHI with Third Parties if placed inside the

Appointment Making Services, (4) failing to take steps to block the transmission of Plaintiffs' and Class Members' PHI to Third Parties advertising companies like Google and Facebook, (5) failing to warn Plaintiffs and Class Members that Defendants were routinely bartering their PHI to Google, New Relic, and other Third Parties, and (6) otherwise ignoring Defendants' common law and statutory obligations to protect the confidentiality of Plaintiffs' and Class Members' PHI.

54. The transmission of Plaintiffs' and Class Members' PHI to Google, New Relic, and other Third Parties was not necessary for Experity's Appointment Making Services or other services or business activities to function. Indeed, the entire publicly stated purpose of those services was to facilitate the provision of healthcare to Plaintiffs and other patients. Given their legal obligations, Defendants did not and could not have had any permissible purpose for deploying Tracking Technologies inside the Appointment Making Services. Defendants' primary, secret, and improper purpose in doing so was, instead, to disclose patients' Sensitive Health Information to Google, Facebook, and other Third Parties in violation of HIPAA.

55. Defendants' improper disclosure of Plaintiffs' and Class Members' PHI to Google has been ongoing for many years and continues to this day.

**B. The Nature of Defendants' unauthorized disclosure of patients' Protected Health Information.**

56. Defendants' disclosure of current and prospective patients' personal healthcare information occurs because Defendants intentionally deployed source code on the the Appointment Making Services, which caused patients' personally identifiable information (as well as the exact contents of their communications) to be transmitted to third parties.

57. By design, third parties receive and record the exact contents of these communications before the full response from Defendants has been rendered on the screen of the patient's or user's computer device and while the communication with Defendants remains ongoing.

58. While the information captured and disclosed without permission may vary depending on the pixel(s) embedded, these "data packets" can be extensive, sending, for example, not just the name of a physician and field of medicine, but also the first name, the last name, email

address, phone number and zip code and city of residence entered into the booking form. In addition, that data is linked to a specific internet protocol ("IP") address.

59. Google Analytics, for example, sends information to Google via scripts running in a person's internet browser so each data packet comes labeled with an IP address that can be used in combination with other data to identify an individual or household.

60. With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. This is why third parties bent on gathering Protected Health Information, like Facebook, implement workarounds that cannot be evaded by savvy users. Facebook's workaround, for example, is called Conversions API (CAPI).

61. CAPI is an effective workaround because it does not intercept data communicated from the user's browser. Instead, Conversions API is designed to create a direct connection between Web hosts' marketing data and Facebook.

62. Thus, the communications between patients and Defendant, which are necessary to use Defendant's website, are actually received by Defendant and stored on its server before CAPI collects and sends the Protected Health Information contained in those communications directly from Defendant to Facebook. Client devices do not have access to host servers and thus cannot prevent (or even detect) this transmission.

63. While there is no way to confirm with certainty that a Web host like Experity has implemented workarounds like CAPI without access to the host server, companies like Facebook instruct companies to use the CAPI in addition to the Pixel and share the same events using both tools because such a redundant event setup allows website owners to share website events with Facebook that the pixel may lose.

64. It is therefore reasonable to assume that a company like Experity that utilizes Tracking Technologies such as Google Analytics may also have deployed server-to-server technologies as a workaround to share additional patient data with third parties for marketing and advertising purposes.

65. The third parties to whom a website transmits data through pixels and associated workarounds do not provide any substantive content relating to the user's communications. Instead,

these third parties are typically procured to track user data and communications for marketing purposes of the website owner.

66. Thus, without any knowledge, authorization, or action by a user, a website owner like Experity can use its source code to commandeer a user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to third parties.

67. For example, when Plaintiff or a Class Member accessed Experity's website pages deploying Google Analytics, the Google Analytics software directed their browsers to send a message to Google's servers. The information that Experity sent to Google included the private information that Plaintiffs and Class Members communicated to Experity's website, such as the type of medical appointment the patient made, the date, and the specific healthcare provider the patient was seeing. Such private information allows third-party advertising companies like Google to determine that a specific patient was seeking a specific type of confidential medical treatment.

68. Websites like those maintained by Expeirty are hosted by a computer server through which the businesses in charge of the website exchange and communicate with internet users via their web browsers.

69. Every website is hosted by a computer server through which the entity in charge of the website exchanges communications with internet users via a client device, such as a computer, tablet, or smart phone, via the client device's web browser.

70. Web browsers are software applications that allow users to exchange electronic communications over the internet.

71. Each exchange of an electronic communication over the internet consists of an HTTP request from a client device and an HTTP response from a server. When a user types a URL into a web browser, for example, the URL is sent as an HTTP request to the server corresponding to the web address, and the server then returns an HTTP response that consists of a web page to render in the client device's web browser.

72. In addition to specifying the URL, HTTP requests can also send data to the host server, including users' cookies. Cookies are text files stored on client devices to record data, often containing sensitive, personally identifiable information.

73. In turn, HTTP responses may consist, among other things, of a web page, another kind of file, text information, or error codes.

74. Source code is not visible on the client device's screen, but it may change the markup of a webpage, thereby changing what is displayed on the client device's screen. Source code may also execute a host of other programmatic instructions, including commanding a web browser to send data transmissions in the form of HTTP requests to the website's server, or, as is the case with Defendant's website, to third parties via pixels.

75. In addition to controlling a website's Markup, Source Code executes a host of other programmatic instructions and can command a website visitor's browser to send data transmissions to third parties via pixels or web bugs,[6] effectively open a spying window through which the webpage can funnel the visitor's data, actions, and communications to third parties, along with patients' personally identifiable information like their Facebook IDs and Google User accounts.

76. For example, Experity's Appointment Making Services' websites included software code that transmitted HTTP requests *directly* to Google, including patients' Protected Health Information, every time a patient interacted with a page on the website.

77. A vast amount of data is communicated back and forth between a patient's browser, Experity's servers, and Google's servers anytime that a patient makes a HTTP request to view a specific page on an Experity website where Google Analytics is deployed. A web page load is not just the product of a couple of communications between a patient's browser and a hospital's website server. A web page load involves tens or even hundreds of requests between a patient's browser and a hospital's server to load individual pages. The interception and sharing of communications content with Google happens contemporaneously in real time with the page load while the communications between a patient's browser and the hospital's website server are in transit:

[6] These pixels or web bugs are tiny image files that are invisible to website users. They are purposefully designed in this manner, or camouflaged, so that users remain unaware of them.




78. Google Analytics intercepts communications content such as full-string URLs using hooks/APIs (e.g., listeners) that are surreptitiously deployed inside patients' browsers via cookies. That technology then shares every communication that patients make with Google.

79. In essence, Experity and GoHealth encouraged patients to use a tapped device, and once the Webpage is loaded into a patient's browser, the software-based wiretap is quietly waiting for private communications on the Webpage to trigger the tap, which intercepts those communications intended only for Defendants and transmits those communications to third parties in real-time, including Google.

**C. Experity and GoHealth Set Up the Appointment Making Services to Permit the Surreptitious Capture of Patients' Protected Health Information and the Disclosure to Third Parties like Google and New Relic.**

80. Experity's Appointment Making Services, including Clockwise MD, are used by numerous healthcare providers around the United States, including GoHealth and Hoag.

81. The Appointment Making Services provide patients and providers:

a. the ability to send and receive electronic communications;

b. computer storage of electronic health record and communications information; and

c. processing services for electronic information.

82. When a patient went to an Experity Appointment Making Services page, Google source code that Experity placed (or aided its healthcare provider clients to place), deposited "first-party" cookies named _ga, _gid, _gcl, and _au on the patient's computing device. As "first party" cookies, the _ga, _gid, _gcl, and _au cookies are disguised as belonging to Experity and/or one of its healthcare provider clients such as GoHealth, which permited them to be placed on the patient's device. In fact, however, these are Third Party cookies.

83. By disguising the Third Party cookies as belonging to Experity, GoHealth, or another Experity client, Experity and GoHealth circumvented attempts to block such tracking.

84. Further, Experity and GoHealth require patients to have first-party cookies enabled to access the Appointment Making Services, which further assures that Experity and GoHealth will be able to deposit Third Party cookies on patient computing devices while patients are using the Appointment Making Services.

85. Experity's software permitted Experity and GoHealth to deploy "custom analytics scripts" within the Appointment Making Services including, for example, Google Analytics, Google Ads, and Google DoubleClick source code (collectively, "Google source code"), through which patient identifiers and communications content were divulged to Google while patients are exchanging communications with their healthcare providers and while the communications content is in electronic storage within the Appointment Making Services.

86. Experity and GoHealth knowingly and secretly deployed Google source code inside the Appointment Making Services.

87. Further, Experity aided the deployment and configuration of Google Tracking Technology to drive patient engagement for its healthcare clients such as GoHealth and Hoag Health. In short, the Tracking Technologies that Experity and GoHealth deployed on the Appointment Making Services deposited Third Party cookies on patients' browsers; disguised

Third Party cookies as being associated with Experity and/or Go Health rather than a Third Party; and commanded Plaintiffs' and Class Members' browsers to re-direct identifiers and communications content on and inside the Appointment Making Services to Third Parties such as Google. Further, Experity and GoHealth implemented multiple measures to ensure that Plaintiffs and Class Members would not and could not prevent all this from taking place.

88. The Third Party source code Experity and GoHealth deployed inside the Appointment Making Services intercepted patients' communications for the purpose of redirecting Plaintiffs' and Class Members' PHI to Third Parties, including at least the following identifiers:

a. Patient IP addresses;

b. Unique, persistent patient cookie identifiers;

c. Device identifiers;

d. Account numbers;

e. URLs;

f. Other unique identifying numbers, characteristics, or codes; and

g. Browser-fingerprints.

89. The Third Party source code that Experity and GoHealth deployed inside the Appointment Making Services also intercepted patients' communications for the purpose of redirecting Plaintiffs' and Class Members' PHI to Google, including at least the following communications content:

a. Actions to sign up for appointments;

b. The names of Plaintiffs' and Class Members' physicians;

c. The reasons for Plaintiffs' and Class Members' appointments;

d. The days and times the appointments were made;

e. Plaintiffs' and Class Members' searches for information regarding their medical providers; and

f. Plaintiffs' and Class Members' physical location.

90. The amount of data collected is significant. When patients interacted with the Appointment Making Services, Experity and GoHealth disclosed a full-string, detailed URL to

Google, typically containing the name of the website, folder, and sub-folders on the webserver; the name of the precise file requested; and the exact contents of the patients' communications.

91. For example, when a patient clicked on a button to make an appointment with a specific physician, Google received confirmation that a patient had booked a specific appointment with a specific healthcare provider at a specific time. Google also received cookies, facility ID codes, reservation codes, IP addresses, and other data that allowed Google to link the patients' appointment information with their Google accounts. In other words, Google was told the patient's name, the fact that the patient had made an appointment, when the patient had made an appointment, and the name of the patient's healthcare provider.

92. Third Party Data Brokers and Advertising Companies like Meta and Google combine the various data they collect about individuals via online analytics technologies in a process known as "“ID bridging.” ID bridging is the process of “piecing together different bits of information about” a user “to confidently infer that it is the same individual accessing a publisher's site or sites from various devices or browsers.”[7] That is, users can be identified and tracked by “bridging” (or linking) their MAIDs to other sources, such as email addresses, geolocation, or phone numbers.




[7] Kayleigh Barber, *WTF Is The Difference Between Id Bridging And Id Spoofing?*, DIGIDAY (July 8, 2024), https://digiday.com/media/wtf-is-the-difference-between-id-bridging-and-id-spoofing/.

93. ID bridging "has long been the foundation of programmatic advertising,"[8] which is the process by which companies "use [] advertising technology to buy and sell digital ads" by "serv[ing] up relevant ad impressions to audiences through automated steps, in less than a second."[9] It entails a "unique identifier[] assigned to individual devices," including "Google's Advertising ID," personal information like geolocation and e-amil address, and "cross-platform linkage."[10] ID bridging is a money-making machine for advertisers and app developers. On the advertiser side, ID bridging "increase the chances of an ad buying platform finding their inventory to be addressable and, therefore, maximizes their 'ad yields.'"[11] And on the app developer side, "publishers can boost revenue from direct-sold campaigns by offering advertisers access to more defined and valuable audiences."[12]

94. In other words, advertisers will be able to find users that are more directly and likely interested in what is being sold by having access to significantly more information. And app users' information will be more valuable (and therefore, bring in more money to app developers) because it is combined with a plethora of other information from various sources.

95. Data brokers and identity graph providers publicly advertise their ability to conduct such bridging.

96. While those within the ID bridging industry describe it as privacy-protective, it is anything but. As courts have noted, the "ability to amass vast amounts of personal data for the purpose of identifying individuals and aggregating their many identifiers" creates "dossiers which can be used to further invade [users] privacy by allowing third parties to learn intimate details of [users'] lives, and target them for advertising, political, and other purposes, ultimately harming them through the abrogation of their autonomy and their ability to control dissemination and use of

---

[8] https://www.adexchanger.com/data-driven-thinking/how-can-id-bridging-the-foundation-of-our-space-suddenly-be-a-bad-thing/.

[9] AMAZON, "Programmatic Advertising," https://advertising.amazon.com/blog/programmatic-advertising#.

[10] Anete Jodzevica, *ID Bridging: The Privacy-First Future of Audience Targeting*, SETUPAD (Nov. 15, 2024), https://setupad.com/blog/id-bridging/. Ironically, the example given in this article is a "hashed email," where the email Defendant collected in this example is not hashed.

[11] Bennett Crumbling, *What Is 'ID Bridging' And How Publishers Use It To Grow Direct And Programmatic Revenue?*, OPTABLE (Aug. 22, 2024), https://www.optable.co/blog/what-is-id-bridging.

[12] *Id.*

information about them." *Katz-Lacabe v. Oracle Am., Inc.*, 688 F. Supp. 3d 928, 940 (N.D. Cal. 2023) (cleaned up).

97. In February 2019, Oracle published a paper entitled "Google's Shadow Profile: A Dossier of Consumers Online and Real World Life," part of which provides a detailed description of Google's ability to identify individual's real world identities via analytics technologies:

> [A] consumer's "shadow profile" [is a] massive, largely hidden dataset[] of online and offline activities. This information is collected through an extensive web of … services, which is difficult, if not impossible to avoid. It is largely collected invisibly and without consumer consent. Processed by algorithms and artificial intelligence, this data reveals an intimate picture of a specific consumer's movements, socioeconomics, demographics, "likes", activities and more. It may or may not be associated with a specific user's name, but the specificity of this information defines the individual in such detail that a name is unnecessary.[13]

98. In other words, ID bridging is dangerous because of the sheer expanse of information being compiled by companies like Experity, GoHealth, and the Third Parties without the knowledge or consent of users, all of which is being done for pecuniary gain.

99. In addition to the methods described above, which are explicitly designed to track individuals across different devices and apps, Third Parties collect other identifying information that allows them to determine whether the same individual is visiting multiple websites or using multiple apps where technology is called or installed directly.

100. For example, if multiple websites or apps are visited from the same location, the pool of potential individuals who are accessing the website or app is narrowed considerably immediately and can be narrowed to a pinpoint over time.

101. HTTP requests, when intercepted by Third Parties, collect device information that can also identify whether the same user is visiting multiple sites or apps, and can distinguish between the devices being used by a particular person. With every visit, and every subsequent HTTP request, the device information will be identical in each.

---

[13] GOOGLE'S SHADOW PROFILE: A DOSSIER OF CONSUMERS' ONLINE AND REAL WORLD LIFE at 1 (Feb. 2019), https://tinyurl.com/2mtuh7vf.

102. As a result of the foregoing, Third Parties consistently received throughout the Class Period the precise text of communications that Plaintiffs and Class Members made about specific appointments and treaters, as well as information identifying them—all of which constitute PHI.

103. The contents of patients' communications with their treating physicians such as GoHealth and Hoag plainly relate to (and disclose) the past, present, or future physical or mental health or condition of individual patients who interact with Experity's Appointment Making Services. 45 C.F.R. § 160.103. Worse, no matter how sensitive the area of the portal site that a patient reviewed, the referral URL was acquired by Third Parties along with other Protected Health Information embedded in patients' interactions with the Appointment Making Services.

104. The nature of the collected data is important. Experity's and GoHealth's unauthorized disclosures resulted in Third Parties' obtaining the appointment history of individual patients, no matter how sensitive their medical condition. Third Parties were then able to correlate that history with other known information regarding the users, including their identity, their prior searches, the time of day, and other user actions. This process resulted in Third Parties acquiring vast repositories of personal data about patients that was then used for marketing purposes—all without patients' knowledge, consent, or authorization, or any further action by patients.

105. By design, Third Parties received the exact contents of patients' communications while they were in transit but before the full response from the healthcare providers had been rendered on the screen of patients' devices.

106. As of the date of the filing of this Complaint, Experity, GoHealth, and many of Experity's other healthcare provider clients are still sharing analytics data from the Appointment Making Services websites with multiple Third Parties, including Google.

### D. What Happened When Patients Communicated with the Appointment Making Services.

107. During the Class Period, when patients used the Appointment Making Services, Experity and/or GoHealth re-directed the precise content of patients' communications and patients' identifiers to Third Parties, including Google at various Google domains.

108. When patients exchanged communications with their healthcare providers via the Appointment Making Services, Experity and/or GoHealth immediately placed the content of that communication in storage.

109. The immediate storage of the contents (and the identity of the person who was exchanging the communication) by Experity and/or GoHealth is required by federal law. *See* 45 C.F.R. § 164.312.

110. Experity and GoHealth further re-directed patients' information to the following Google domain: www.google-analytics.com.

111. The patient identifiers that were re-directed to google-analytics.com include:

a. The patient's IP address;

b. The patient's User-Agent information and other data that, when combined, is sufficient to uniquely identify the device;

c. Reservation codes generated by the healthcare provider that were linked to the specific patient; and

d. Third Party cookies disguised as cookies belonging to Experity and/or GoHealth, which serve as device identifiers and that the Third Party connects to patients. These cookies include but may not be limited to Google's _ga and _ga_HK3FDYQCRR cookies.

112. Google will always receive at least the device-identifying NID cookie regardless of whether a person is signed into a Google Account. Regardless of a person's Google Account holder status, the NID cookie is a device identifier that is considered personally identifiable as a matter of law when the data includes PHI protected by federal law.

113. Further, if a Google Account holder has signed in to a Google Account on the device in question and did not formally sign out before sending a separate communication to the Appointment Making Services, then Experity and/or GoHealth will re-direct both the device identifier cookie (IDE) and the Google Account identifying cookie (DSID). By re-directing both cookies at the same time, Experity and GoHealth enable Google to connect the IDE device-identifying cookie to specific Google Account holder such that, once Google has made the

connection, it only needs to see the IDE cookie in order to connect a later re-directed communication with the specific Google Account holder.

**E. Experity's and GoHealth's Actions Permitted Google to Connect Patient's Data Across Domains.**

114. Google publicly states that it connects data that advertisers and publishers (like Experity and GoHealth) send to it across the different Google Analytics, Google.com, and Doubleclick.net domains.

115. Experity and GoHealth use the same tools and source code throughout the Appointment Making Services. Thus, the types of Google cookies deposited on patient devices and the types of PHI and communications content disclosed (as explained above) occurred every time a patient logged in to or took any action within the Appointment Making Services.

**F. Google's Business Model: Exploiting Consumers' Personal Information for Profit.**

116. By any measure, Google is the world's largest data company. Among other services, Google operates the world's most popular search engine (Google), email provider (Gmail), video website (YouTube), mapping service (Google Maps), Internet analytics service for web developers (Google Analytics), and web-browser (Chrome). It also operates various ad services that are among the world's most popular in their respective categories, including the advertising services of Google DoubleClick and Google AdWords.

117. Google Analytics has massive reach. As described by the Wall Street Journal, it is "far and away the web's most dominant analytics platform" and "tracks you whether or not you are logged in."[14]

118. Google cookies provide personally identifiable data about patients who visit the Appointment Making Services to Google. Experity and GoHealth transmit personally identifiable Google cookie data to Google.

---

[14] *Who Has More of Your Personal Data than Facebook? Try Google*, The Wall Street Journal (April 22, 2018) (available at https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401).

119. Google specifically warns developers and advertisers that Google Analytics is not appropriate for HIPAA-covered entities like Experity, publicly stating:[15]

> Customers must refrain from using Google Analytics in any way that may create obligations under HIPAA for Google. HIPAA-regulated entities using Google Analytics must refrain from exposing to Google any data that may be considered Protected Health Information (PHI), even if not expressly described as PII in Google's contracts and policies. Google makes no representations that Google Analytics satisfies HIPAA requirements and does not offer Business Associate Agreements in connection with this service.
>
> For HIPAA-regulated entities looking to determine how to configure Google Analytics on their properties, the HHS bulletin provides specific guidance on when data may and may not qualify as PHI. Here are some additional steps you should take to ensure your use of Google Analytics is permissible:
>
> - Customers who are subject to HIPAA must not use Google Analytics in any way that implicates Google's access to, or collection of, PHI, and may only use Google Analytics on pages that are not HIPAA-covered.
> - Authenticated pages are likely to be HIPAA-covered and customers should not set Google Analytics tags on those pages.
> - Unauthenticated pages that are related to the provision of health care services, including as described in the HHS bulletin, are more likely to be HIPAA-covered, and customers should not set Google Analytics tags on HIPAA-covered pages.
> - Please work with your legal team to identify pages on your site that do not relate to the provision of health care services, so that your configuration of Google Analytics does not result in the collection of PHI.

120. Google tracks Internet users with IP addresses, cookies, geolocation, and other unique device identifiers.

121. Google cookies are personally identifiable. For example, Google explains the following about certain cookies that it uses:

a. "[C]ookies called 'SID' and 'HSID' contain digitally signed and

---

[15] Google, *HIPAA and Google Analytics*, https://support.google.com/analytics/answer/13297105?hl=en

encrypted records of a user's Google account ID and most recent sign-in time."[16]

b. "Most people who use Google services have a preferences cookie called 'NID' in their browsers. When you visit a Google service, the browser sends this cookie with your request for a page. The NID cookie contains a unique ID Google uses to remember your preferences and other information[.]"[17]

c. "We use cookies like NID and SID to help customize ads on Google properties, like Google Search. For example, we use such cookies to remember your most recent searches, your previous interactions with an advertiser's ads or search results, and your visits to an advertiser's website. This helps us to show you customized ads on Google."[18]

d. "We also use one or more cookies for advertising we serve across the web. One of the main advertising cookies on non-Google sites is named 'IDE' and is stored in browsers under the domain doubleclick.net. Another is stored in google.com and is called ANID. We use other cookies with names such as DSID, FLC, AID, TAID, and exchange_uid. Other Google properties, like YouTube, may also use these cookies to show you more relevant ads."[19]

122. Google warns web-developers that Google marketing tools are not appropriate for every type of website or webpage, including health-related webpages and websites.

//

//

---

[16] *Privacy & Terms, Types of Cookies Used by Google*, Google, http://web.archive.org/web/20210916060858/https:/policies.google.com/technologies/cookies?hl=en-US (archived from September 16, 2021).

[17] *Privacy & Terms, Types of Cookies Used by Google*, Google, http://web.archive.org/web/20210101020222/https:/policies.google.com/technologies/cookies?hl=en-US (archived from January 1, 2021).

[18] *Id.*

[19] *Id.*

123. Google also warns developers in its Personalized Advertising policies page that "Health in personalized advertising" is a "Prohibited category" for Google's personalized advertising tools. Specifically, Google's advertising policies page states:[20]

> We take user privacy very seriously, and we also expect advertisers to respect user privacy. These policies define how advertisers are allowed to collect user data and use it for personalized advertising. They apply to advertisers using targeting features, including remarketing, affinity audiences, custom affinity audiences, in-market audiences, similar audiences, demographic and location targeting, and keyword contextual targeting. …
>
> You aren't allowed to do the following:

> ⊗ Collect information related to sensitive interest categories (see Personalized advertising policy principles below for more about sensitive interest categories)

124. The United States Department of Health and Human Services has made clear that "it is insufficient for a tracking technology vendor to agree to remove PHI from the information it receives or to de-identify the PHI before the vendor saves the information. Any disclosure of PHI to the vendor without individuals' authorizations requires the vendor to have a signed BAA in place and requires that there is an applicable Privacy Rule permission for disclosure."[21]

125. Google refuses to sign business associate agreements ("BAA") with healthcare companies like Experity and GoHealth.

126. After Google collects data that is transmitted to it by Google Analytics, Google analyzes and processes that data for use in selling advertising.

127. Google also uses the data that it collects via Tracking Technology to provide clients like Experity and GoHealth with analytics data that those clients use to bolster their marketing and advertising strategies and improve the ROI on their marketing and digital advertising spend. Clients like Experity and GoHealth also use the analytics data that they receive back from Google to optimize their websites.

---

[20] *Advertising Policies Help, Personalized Advertising*, Google, http://web.archive.org/web/20191031223446/https://support.google.com/adspolicy/answer/143465?hl=en (archived from October 31, 2019).

[21] Office for Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

128. Experity and GoHealth benefited financially from sharing Plaintiffs' and Class Members' PHI via Tracking Technologies by receiving, among other things, better and more cost-effective marketing in exchange for disclosing patients' PHI.

**G. The Operation of Other Third Parties' Tracking Technologies.**

129. Other Third Parties' Tracking Technologies such as New Relic operated in a substantially similar manner to Google's tech, including in their disclosure of patients' identifiers and communications and the linking of data disclosed to patients' real-world identities. These technologies were deployed by Experity on behalf of itself, deployed by Experity on behalf of one of its healthcare provider clients, or deployed by GoHealth using Google Tag Manager source code that Experity enabled on its websites.

130. The Google Tag Manger software operates like a "tracking code container," which made it simple for Experity's clients to deploy tracking pixels within the Appointment Making Services.

131. When patients exchanged communications with their healthcare providers via the Appointment Making Services, Experity and GoHealth immediately placed the content of those communication in storage.

132. The immediate storage of the contents (and the identity of the person who was exchanging the communication) is required by federal law. *See* 45 C.F.R. § 164.312.

133. Experity and GoHealth further re-directed patients' information to various Third Party domains. The patient identifiers that were re-directed to these Third Party domains include:

a. The patient's IP address;

b. The patient's User-Agent information and other data that, when combined, is sufficient to uniquely identify the device;

c. Reservation codes;

d. Facility IDs; and

e. Third Party cookies, and first-party cookies disguised as cookies belonging to Experity or GoHealth, which serve as device identifiers and that Third Parties connect to patients.

134. Third Parties received at least the device-identifying IP address and User-Agent information, along with patients' appointment information. While the specific cookies and identifiers varied by Third Party, the stored identifiers often function in the same manner as Google's identifiers. For example, the Meta Pixel may transmit the third-party "c_user" cookie which contains the Facebook user ID for logged in users and the first-party "_fbp" cookie, containing an unique identifier specific to the patient's web browser. By receiving both identifiers, Meta is able to link the _fbp device-identifying cookie to the patient's specific Facebook account. Once Meta has made that connection, it only needs to receive the _fbp cookie to connect a later re-directed communication with the patient's Facebook profile.

135. Experity and GoHealth use the same tools and source code throughout the Appointment Making Services. Thus, the types of Third-Party cookies deposited on patient devices and the types of PHI and communications content disclosed (as explained above) occurred every time a patient logged in to or took any action within the Appointment Making Services.

**H. Data Brokers' Business Models: Exploiting Consumers' Personal Information for Profit.**

136. Although Google's advertising and analytics technology is perhaps the most pervasive across the internet, other Third Parties' advertising platforms also have massive reach. Third Parties' cookies provide personally identifiable data about patients who visit the Appointment Making Services to those Third Parties. Experity and GoHealth transmit personally identifiable Third Party cookie data to those Third Parties. Third Parties also track Internet users with IP addresses, cookies, geolocation, and other unique device identifiers.

137. Third Party cookies are personally identifiable.

138. The United States Department of Health and Human Services has made clear that "it is insufficient for a tracking technology vendor to agree to remove PHI from the information it receives or to de-identify the PHI before the vendor saves the information. Any disclosure of PHI

to the vendor without individuals' authorizations requires the vendor to have a signed BAA in place and requires that there is an applicable Privacy Rule permission for disclosure."[22]

139. Many Third Parties refuse to sign business associate agreements ("BAA") with healthcare companies like Experity.

140. After Third Parties collect data that is transmitted to them, they analyze and process that data for use in selling advertising.

141. Third Parties also use the data that they collect via Tracking Technologies to provide clients like Experity and GoHealth with analytics data that those clients use to bolster their marketing and advertising strategies and improve the ROI on their marketing and digital advertising spend. Clients like Experity and GoHealth also use the analytics data that they receive back from Third Parties to optimize their websites. Experity and GoHealth benefited financially from sharing Plaintiffs' and Class Members' PHI via Tracking Technologies by receiving, among other things, better and more cost-effective marketing in exchange for disclosing patients' PHI.

### I. Experity and GoHealth Shared a Trove of Personally Identifiable Information with Google.

142. IP Addresses are Personally Identifiable.

143. An IP address is a number that identifies a computer or other device (such as a mobile phone) connected to the Internet.

144. IP addresses are used to identify and route communications on the Internet.

145. IP addresses of individual Internet users are used by websites and tracking companies to facilitate and track Internet communications and target those users with advertising using IP addresses.

146. Under HIPAA, an IP address is considered PII. *See* 45 C.F.R. § 164.514(b)(2)(i)(O).

147. Whenever a patient logged into or used the Appointment Making Services, Experity and/or GoHealth caused the disclosure of the patient's IP addresses to Third Parties, along with

---

[22] Office for Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

**J. Internet Cookies are Personally Identifiable.**

148. In the early years of the Internet, advertising on websites followed the same model as traditional newspapers. Just as a sporting goods store would choose to advertise in the sports section of a traditional newspaper, advertisers on the early Internet paid for ads to be placed on specific web pages based on the type of content displayed on the web page.

149. Computer programmers eventually developed "cookies"—small text files that web servers can place on a person's device when that person's web browser interacts with the server. Cookies can perform different functions, like saving a user's login or other site settings. Eventually, some cookies were designed to acquire and record an individual Internet user's communications and activities on websites across the Internet.

150. Cookies are designed to and, in fact, most often do operate as means of identification for Internet users.

151. Cookies are protected personal identifiers under HIPAA. 45 C.F.R. § 164.514(b)(2)(i)(H), (J), (M), (N), and (R).

152. In general, cookies are categorized by duration and party.

153. There are two types of cookies classified by duration:

a. "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie. The user's web browser typically deletes session cookies when the user closes the browser.

b. "Persistent cookies" are designed to survive beyond a single Internet-browsing session. The party creating the persistent cookie determines its lifespan. As a result, a persistent cookie can acquire and record a user's Internet communications for years and over dozens or hundreds of websites. Persistent cookies are sometimes called "tracking cookies."

154. Cookies are also classified by the party that uses the collected data:

c. “First-party cookies” are set on a user’s device by the website with which the user is exchanging communications. First-party cookies can be helpful to the user, server, and/or website to assist with security, log in, and functionality.

d. “Third-party cookies” are set on a user’s device by website servers other than the website or server with which the user is exchanging communications. For example, the same patient who visits an Experity Appointment Making Services will typically also have cookies on their device from third parties, such as Google. Unlike first-party cookies, third-party cookies are not typically helpful to the user. Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

155. Data companies like Google and other Third Parties have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications to sell advertising that is customized to that person. To build individual profiles of Internet users, third-party data companies assign each user a unique identifier or set of unique identifiers.

156. Web browsers generally scope cookies to a particular domain and apply security controls that limits how data from one domain may be accessed in another. Ordinarily, Javascript running on a webpage can only read cookies associated with that webpage’s own domain, and cookies set for a third-party’s domain are only readable by that Third Party. These limitations are due to an Internet security policy known as the same-origin policy that requires web browsers to prevent scripts on one domain from accessing the cookies of a separate domain. For example, although Experity and GoHealth can deploy source code that uses Third Party cookies to help Third Parties acquire and record the patient’s communications, they are not permitted direct access to Third Party cookie values. The reverse is also true: Third Parties were not provided with direct access to the values associated with first-party cookies set by Experity or GoHealth.

157. Google and other Third-Parties designed their tools to avoid cross domain restrictions by operating through first-party identifiers and linking those identifiers to profiles maintained by the Third Parties.Companies like Experity and GoHealth then implemented these tools, granting third-parties access to identifiers and other data generated in Experity's and GoHealth's first-party context.

158. JavaScript source code developed by third-party data companies and placed on a webpage by companies such as Experity and GoHealth can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company. This technique is known as "cookie synching," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user. Once the cookie synching operation is completed, the two websites can exchange any information they have collected and recorded about a user that is associated with a cookie identification number. The technique can also be used to track an individual who has chosen to use third-party cookie blockers.

159. Cookie syncing is a process that "allow[s] web companies to share (i.e., synchronize) cookies and match the different IDs they assign for the same user while they browse the web."[23] This allows entities to circumvent "the restriction that sites can't read each other's cookies, in order to better facilitate targeting and real-time bidding."[24]

> Cookie syncing works as follows:
> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rdparties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.
>
> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com.

---

[23] Panagiotis Papadopoulos *et al.*, *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[24] Gunes Acar *et al.*, *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014).

> However, as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).
>
> …
>
> When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user. Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) synchronize (i.e., join) two different identities (cookies) of the same user on the web.[25]




[25] Papadopoulos, *supra*, at 1433.

160. Through this process, Third Party trackers like Google's are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though they "do not have any collaboration with" the third party.[26]

161. On the flip side, "CSync may re-identify web users even after they delete their cookies."[27] "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[28] But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure. Consequently: (i) users cannot abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link [a] user's history across state resets."[29]

162. Thus, "syncing userIDs of a given user increases [] user identifiability while browsing, thus reducing their overall anonymity on the Web."[30]

163. Cookie syncing is precisely what is happening here. Third Parties' trackers sync their unique user identifiers with other third parties on the websites. The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all the information about that user with one another (because the cookie is linked to a specific user profile). This prevents users from being anonymous when they visit websites.

164. Whenever a patient uses the Appointment Making Services, Experity and GoHealth intercepts, uses, and causes the disclosure of patient cookie identifiers with each re-directed communication described herein, including patient communications about providers, conditions, treatments, appointments, registration, and log-ins to the Appointment Making Services.

165. Cookie disclosures by Experity and/or GoHealth included the deployment of cookie synching techniques through which Experity and/or GoHealth deposits Third Parties identifiers on patient computing devices as first-party cookies.

---

[26] *Id.* at 1434.
[27] *Id.*
[28] *See id.*
[29] *Id.*
[30] *Id.* at 1441.

166. Experity and GoHealth then shared those identifiers with additional Third Parties, which use them for matching and linking the patient's browser or device to identifiers and profiles maintained by those additional Third Parties.

**K. Browser-Fingerprints are Personally Identifiable.**

167. Browser-fingerprints are information collected about a computing device that can be used to identify the device.

168. Browser-fingerprints can be used to identify devices when the devices' IP addresses are hidden, and cookies are blocked.

The Electronic Frontier Foundation has explained:

> When a site you visit uses browser fingerprinting, it can learn enough information about your browser to uniquely distinguish you from all the other visitors to that site. Browser fingerprinting can be used to track users just as cookies do, but using much more subtle and hard-to-control techniques. In a paper EFF released in 2010, we found that a majority of users' browsers were uniquely identifiable given existing fingerprinting techniques. Those techniques have only gotten more complex and obscure in the intervening years. By using browser fingerprinting to piece together information about your browser and your actions online, trackers can covertly identify users over time, track them across websites, and building an advertising profile of them.[31]

169. In 2017, researchers showed that browser fingerprinting techniques can successfully identify 99.24 percent of Internet users.[32]

170. Browser-fingerprints are protected personal identifiers under HIPAA. 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

171. Whenever patients used the Appointment Making Services, Experity and/or GoHealth intercepted, exploited, and caused disclosures of data sufficient to form browser fingerprints for each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

[31] Katarzyna Szymielewicz and Bill Dudington, *The GDPR and Browser Fingerprinting: How It Changes the Game for the Sneakiest Web Trackers*, Electronic Frontier Foundation (June 19, 2018) (available at https://www.eff.org/deeplinks/2018/06/gdpr-and-browser-fingerprinting-how-it-changes-game-sneakiest-web-trackers).

[32] Yinzhi Cao, Song Li and Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features*, Proceedings of the Network and Distributed Security Symposium (March 2017) (available at https://yinzhicao.org/TrackingFree/crossbrowsertracking_NDSS17.pdf).

172. Each of the individual data elements described above is personally identifiable on its own. However, disclosures of such personally identifiable data elements by Experity and/or GoHealth do not occur in a vacuum. The disclosures of the different data elements are tied together and, when taken together, are even more accurate in identifying individual patients, particularly when disclosed to data companies such as Google and other Third Party internet marketing companies that expressly state that they use such data elements to identify individuals and have developed sophisticated algorithms and infrastructure for doing so.

173. Experity and GoHealth knowingly disclosed information that allowed Google and other Third-Party advertisers to link Plaintiffs' and Class Members' PHI to their private identities and target them with advertising. Experity and GoHealth intentionally shared the PHI of Plaintiffs and Class Members with Google in order to gain access to the benefits of Google Analytics and other Third-Party Tracking Technologies.

174. The information Plaintiffs and Class Members provided to Experity and GoHealth via the Appointment Making Services (which is then shared illegally with Google and other Third Parties) can be combined with other information in the Third Parties' possession, like Plaintiffs' and Class Members' names, email addresses, dates of birth, and phone numbers, to more effectively target Plaintiffs and Class Members with advertisements or resell their data.

175. Experity and GoHealth each knew that by embedding Google Analytics and other Tracking Technologies in the Appointment Making Services, they were permitting Google and other Third Parties to collect, use, and share Plaintiffs' and Class Members' PHI, including sensitive medical information and personally identifiable data.

176. Experity and GoHealth were also aware that such information would be shared with Google simultaneously with patients' interactions with the Appointment Making Services. Experity and GoHealth chose to barter Plaintiffs' and Class Members' PHI to Google and other Third Parties because they wanted access to Google Analytics and other Third-Party analytics tools. While that bargain financially benefited Experity, GoHealth,and Google, it also betrayed the rights of Plaintiffs and Class Members.

**L. Experity and GoHealth Improperly Disclosed Plaintiffs' and Class Members' Protected Health Information to Third Parties Throughout the Class Period.**

177. The design and operation of the Appointment Making Services, including Clockwise MD, as described in this Complaint, was ongoing, consistent, and systematic throughout the Class Period.

178. The Appointment Making Services operated as described above with respect to the named Plaintiffs in this matter.

179. For example, when Plaintiff Jamie Doe made urgent care appointments with GoHealth at its Piedmont Avenue in Oakland, California, she was taken to a website located at https://www.clockwisemd.com/hospitals/14710/appointments/new that Experity operated for GoHeath, which was built using Experity's Clockwise MD appointment making functionality. Once on the Experity website, Plaintiffs were asked to fill out a detailed form, which included questions such as (1) the reason for their visit, (2) their name, (3) their cell phone number, (4) their email address, (5) their zip code, (6) the date and time of their visit, (7) their current patient status with GoHealth.



***Plaintiff Janice Doe***

180. Plaintiff Janice Doe is a patient of GoHealth who has used the Appointment Making Services to make urgent care appointments at a GoHealth facility in Castro, on Market Street in San Francisco, California, including for COVID testing.

181. When she made the appointments, Plaintiff Janice Doe was asked to fill out a detailed online form when she made urgent care appointments using the Appointment Making Services.

182. Without Plaintiff's knowledge or consent, every time that she made an urgent care appointment via the Appointment Making Services, the Tracking Technologies Experity and GoHealth deployed , including Google Analytics and Google Double Click tracking technologies, shared her PHI with Google, including (1) her patient status, (2) the fact that she had made a medical appointment, (3) the name of her healthcare provider, (4) the time and date she made her appointment, and (5) the unique facility that GoHealth assigned to the specific urgent care clinic where Plaintiff Janice Doe was being treated.

183. Along with this PHI, Experity and GoHealth also shared data that allowed Google to specifically identify Plaintiff Janice Doe, including her Google User ID, IP address, Google cookies, her geolocation data, her browser fingerprint, and her user agent data.

184. As a result of Experity's and GoHealth's deployment of Google Analytics inside the Appointment Making Services, Google was able to link Plaintiff Janice Doe's PHI with her real-world identity and then exploit her PHI for commercial marketing and advertising purposes.

***Plaintiff Jamie Doe***

185. Plaintiff Jamie Doe is a patient of GoHealth who has used the Appointment Making Services to make urgent care appointments, including urgent care appointments at a GoHealth facility on Piedmont Avenue in Oakland, California for X-Rays, MRIs, and orthopedic care in March 2025.

186. When she made the appointments, Plaintiff Jamie Doe was asked to fill out a detailed online form when she made urgent care appointments using the Appointment Making Services.

187. Without the knowledge or consent of Plaintiff Jamie Doe, every time that she made an urgent care appointment via the Appointment Making Services, the Tracking Technologies Experity and GoHealth deployed , including Google Analytics and Google Double Click tracking technologies, shared her PHI with Google, including (1) her patient status, (2) the fact that she had made a medical appointment, (3) the name of her healthcare provider, (4) the time and date she made her appointment, and (5) the unique facility that GoHealth assigned to the specific urgent care clinic where Plaintiff R.W. was being treated.

188. Along with this PHI, Experity and GoHealth also shared data that allowed Google to specifically identify Plaintiff Jamie Doe, including her Google User ID, IP address, Google cookies, her geolocation data, her browser fingerprint, and her user agent data.

189. As a result of Experity's and GoHealth's deployment of Google Analytics inside the Appointment Making Services, Google was able to link Plaintiff Jamie Doe's PHI with her real-world identity and then exploit her PHI for commercial marketing and advertising purposes.

***Plaintiff John Doe***

190. Plaintiff John Doe is a patient of Hoag Health in California, who has made multiple urgent care appointments at Hoag facilities, including Hoag Urgent Care Huntington Harbor, via the Appointment Making Services. These included appointments that Plaintiff John Doe made seeking treatment for bronchitis, eye and ear infections, breathing issues, and digestive issues.






191. When making urgent care appointments, Plaintiff John Doe entered details into the online forms provided by Experity, including details about his bronchitis, eye infections, digestive issues, ear infections, and breathing issues. Without Plaintiff John Doe's knowledge, when he clicked the "Submit" button to secure an urgent care appointment with Hoag, the Google Analytics and Google Double Click Tracking Technologies that Experity deployed for itself and for Hoag Health on the appointment making form shared Plaintiff John Doe's PHI with Google, including details about (1) his patient status, (2) the fact that he had made a medical appointment, (3) the name of his healthcare provider, (4) the time and date of his appointment, (5) the unique reservation code that Hoag assigned to his appointment, (6) the unique facility ID that Hoag assigned to the specific urgent care clinic where Plaintiff John Doe was being treated, and (7) details about his symptoms, including his seeking treatment for bronchitis, eye and ear infections, breathing issues, and digestive issues.

192. Along with this PHI, Experity and Hoag Health also shared data that allowed Google to specifically identify Plaintiff John Doe, including his unique Google user account number, IP address, Google cookies that linked his PHI with his Google user account, his geolocation data, his browser fingerprint, and his user agent data.

193. Without Plaintiff John Doe's knowledge or consent, every time he made an urgent care appointment, Experity and Hoag Health intercepted and disclosed his confidential PHI to Google.

194. As a result of Experity's deployment of Google Analytics inside the Appointment Making Services, both its own and those of its healthcare provider clients, including Hoag Health, Google was able to link Plaintiff John Doe's PHI with his real-world identity, including by linking this data to her Google account, and then used and sold his PHI for commercial purposes. For example, after entering his data on Experity's online forms and submitting his appointment information, Plaintiff John Doe began receiving advertisements on his social media accounts related to the specific medical conditions for which he had made urgent care appointments, including advertisements for eye medications and advertisements for colonoscopy treatments and physicians.

***Plaintiff Jane Doe***

195. Plaintiff Jane Doe is a patient of Hoag Health who has also used the Appointment Making Services to make urgent care appointments with Hoag Health, including urgent appointments at Hoag Urgent Care Aliso Viejo in connection with medical treatment that Plaintiff Jane Doe has received for Covid-19, heart issues, and fever and symptoms of the flu. Like Plaintiff John Doe, when Plaintiff Jane Doe made urgent care appointments using the Appointment Making Services she was asked to fill out a detailed online questionnaire, which requested information such as her patient status, her symptoms, her name, her telephone number, and her email address.

196. Without Plaintiff Jane Doe's knowledge or consent, every time that she made an appointment via the Appointment Making Services, the Google Analytics and Google Double Click Tracking Technologies that Experity and Hoag Healthdeployed on the Appointment Making Services website shared her PHI with Google, including (1) her patient status, (2) the fact that she had made a medical appointment, (3) the name of her healthcare provider, (4) the time and date she made her appointment, (5) the unique reservation code that Hoag assigned to her appointment, and (6) the unique facility ID that Hoag Health assigned to the specific urgent care clinic where Plaintiff Jane Doe was being treated.

197. Without Plaintiff Jane Doe's knowledge or consent, every time he made an urgent care appointment, the Tracking Technologies deployed by Experity and GoHealth intercepted and disclosed his confidential PHI to Google, including information about his patient status, the appointments she made, her treating physician, and the precise days and times she made urgent care appointments.

198. Along with this PHI, Experity and Hoag Health also shared data that allowed Google to specifically identify Plaintiff Jane Doe, including her Google User ID, IP address, Google cookies that linked with her PHI with her Google user account, her geolocation data, his browser fingerprint, and her user agent data.

***Plaintiff Janet Doe***

199. Plaintiff Janet Doe is also a patient of Hoag Health who has used the Appointment Making Services to make urgent care appointments, including urgent care appointments at Hoag Urgent Care Aliso Viejo for acute hip and leg pain.

200. When she made her appointments, Plaintiff Janet Doe was asked to fill out a detailed online form when she made urgent care appointments using the Appointment Making Services.

201. Without Plaintiff Janet Doe's knowledge or consent, every time that she made an urgent care appointment via the Appointment Making Services, the Tracking Technologies Experity and GoHealth deployed , including Google Analytics and Google Double Click tracking technologies, shared her PHI with Google, including (1) her patient status, (2) the fact that she had made a medical appointment, (3) the name of her healthcare provider, (4) the time and date she made her appointment, (5) the unique reservation code that Hoag assigned to her appointment, and (6) the unique facility ID that Hoag Health assigned to the specific urgent care clinic where Plaintiff Janet Doe was being treated.

202. Along with this PHI, Experity and Hoag Health also shared data that allowed Google to specifically identify Plaintiff Janet Doe, including her Google User ID, IP address, Google cookies, her geolocation data, her browser fingerprint, and her user agent data.

//

//

203. As a result of Experity's and Hoag Health's deployment of Google Analytics inside the Appointment Making Services, Google was able to link Plaintiff Janet Doe's PHI with her real-world identity then exploited her PHI for commercial marketing and advertising purposes.

***Plaintiff Julia Doe***

204. Plaintiff Julia Doe is a patient of Midwest Express Clinic ("Midwest Express") who has used Experity's Appointment Making Services to make urgent care appointments, including urgent care appointments at Midwest Express Clinic in Logan Square and Wicker Park in Chicago, Illinois, including to treat a viral infection, to take a pregnancy test, for ankle and wrist injuries, and for a B-12 shot. When making her appointment, Plaintiff Julia Doe was asked out to fill out an online form using Experity's Appointment Making Services.




205. Without Plaintiff Julia Doe's knowledge or consent, every time that she made an urgent care appointment via the Experity Appointment Making Services, the Tracking Technology

Experity deployed on the Appointment Making Services for Midwest Express, including Google Analytics and Google Double Click tracking technologies, shared her PHI with Google, including (1) her patient status, (2) the fact that she had made a medical appointment, (3) the time and date she made her appointment, and (4) and the name of her medical provider. Along with this PHI, Experity also shared data that allowed Google to specifically identify Plaintiff Julia Doe, including her Google User ID, IP address, Google cookies, her geolocation data, her browser fingerprint, and her user agent data.

206. Along with this PHI, Experity and Midwest Express also shared data that allowed Google to specifically identify Plaintiff Julia Doe, including her Google User ID, IP address, Google cookies, her geolocation data, her browser fingerprint, and her user agent data.

207. As a result of Experity's deployment of Google Analytics inside Experity's Appointment Making Services, both its own and the Tracking Technologies that it installed on behalf of Midwest Express, Google was able to link Plaintiff Julia Doe's PHI with her real-world identity and then exploit her Protected Health Information for commercial marketing and advertising purposes.

***Plaintiff Jasmine Doe***

208. Plaintiff Jasmine Doe is a patient of of Midwest Express Clinic who has used Experity's Appointment Making Services to make urgent care appointments, including urgent care appointments at Midwest Express Clinic at Evergreen Park in Chicago, Illinois. When making these appointments, Plaintiff Jasmine Doe was asked to fill out an online form using Experity's Appointment Making Services.

209. Without Plaintiff Jasmine Doe's knowledge or consent, every time that she made an urgent care appointment via the Experity Appointment Making Services, the Tracking Technology that Experity deployed, including Google Analytics and Google Double Click, shared her PHI with Google, including (1) her patient status, (2) the fact that she had made a medical appointment, (3) the time and date she made her appointment, and (4) the name of her healthcare provider.

210. Along with this PHI, Experity also shared data that allowed Google to specifically identify Plaintiff Jasmine Doe, including her Google User ID, IP address, Google cookies, her geolocation data, her browser fingerprint, and her user agent data.

211. As a result of Experity's deployment of Google Analytics inside Experity's Appointment Making Services, both its own and the Google Analtyics technology that it installed on behalf of Midwest Express, Google was able to link Plaintiff Jasmine Doe's PHI with her real-world identity and then exploit her Protected Health Information for commercial marketing and advertising purposes.

212. Plaintiffs' experiences are representative of what happened to all Class Members who made urgent care appointments using the Experity Appointment Making Services during the Class Period.

213. Every time that Plaintiffs and Class Members accessed the Experity Appointment Making Services, the Tracking Technology employed by Experity, on behalf of itself and on behalf of its health care clients like Hoag, GoHealth, and Midwest Express, intercepted and shared their appointment data with Third Parties, along with other PHI such as their patient status, the name of their healthcare providers, the fact that they had made a medical appointment, the time and date they made the appointment, and the reason for their appointments, along with PII such as their IP addresses, browser fingerprints, and Third Party cookies. Such Protected Health Information, including Plaintiffs' patient status, their medical conditions, and when and where they sought treatment are specifically protected by HIPAA against unauthorized disclosure to third parties. E.g., *Hartley v. Univ. of Chicago Med.* Ctr., No. 22 CV 5891, 2025 WL 2802317, at *4 (N.D. Ill. Oct. 1, 2025).

214. While Experity could have sought consent from Plaintiffs and Class Members to intercept, collect, and share their PHI with Third Parties, Experity chose not to because of the likelihood that the majority of patients would refuse. Instead, Experity surreptitiously deployed hidden Tracking Technologies in an effort to circumvent patients' refusing the exploitation of their Protected Health Information for advertising and marketing purposes.

215. Experity intentionally deployed Tracking Technologies inside its Appointment Making Services (and thereby shared Plaintiffs' PHI with Google) in return for access to free marketing tools and aggregated data about how individuals interacted with its Appointment Making Services. Experity took the aggregated patient data it received back from the Third Parties and used that data to optimize its marketing and product designs, thereby increasing Experity's profitability at the expense of Plaintiffs and Class Members. Experity further procured its clients' use of tracking technologies for marketing and advertising purposes via Google Tag Manger source code that Experity enabled on its websites.

216. Each Class Member had his or her interactions with the Appointment Making Services intercepted and shared with Third Parties in a manner substantially similar to what occurred with the named Plaintiffs as detailed above, such that named Plaintiffs' claims are typical of those of the proposed Class as a whole.

**M. Third Parties like Google Share the Data and Information Collected from Tracking Technologies with Data Brokers Who Further Exploit This Information.**

217. In addition to using the data for their own purposes, the Third Parties that obtained patients' PHI from Tracking Technologies installed on the Appointment Making Services further profited from Experity's and GoHealth's improper practices by selling patients' PHI to other data brokers.

218. As one study found, "on average, companies that allow external sharing of [] data assets have data that has been exposed to 42 4th-party domains."[33]

219. Consequently, a fourth party that did not have a tracker directly installed on the website may obtain and use information collected via Third Party trackers to provide direct advertisements to patients on the fourth party's platform.

//
//

[33] Adam Gavish, *Your 3rd Party Collaborators Share Your Company's Data with 4th Parties*, DOCONTROL (Feb. 27, 2025), https://www.docontrol.io/blog/your-3rd-party-collaborators-share-your-company-data-with-4th-parties#:~:text=What%20is%204th%2DParty%20Data,side%20effect%20of%20SaaS%20collaboration.

220. For example, Facebook and Google have engaged in practices that allowed for the sharing or accessibility of user data between their platforms.[34] Because of this, advertisements on Facebook may reflect information collected via a Google tracker, either because of information shared directly or indirectly between the companies.

221. Facebook and Google both act as data brokers, meaning they collect data, compile it into datasets, and sell it to fourth parties.[35] Two other popular data brokers are Acxiom and Oracle Data Cloud ("Oracle"). Facebook and Google have been known to buy information from, and sell information to, such data brokers.[36]

222. Because of this, one company's tracker (*e.g.*, Google Analytics) may collect information, compile it into a dataset (owned by Google), and act as a data broker to sell it to another Third Party (*e.g.,* Facebook), which uses the information to advertise for various parties (like other healthcare institutions) on its own platform.[37] Alternatively, one company's tracker (*e.g.*, Google Analytics) may collect information, compile it into a dataset (owned by Google), and act as a data broker to sell it to a fourth-party advertiser (*e.g.*, another healthcare institution), which uses the information to advertise for on other platforms (*e.g.*, Facebook).[38] Or, one company's tracker (*e.g.*, Google Analytics) may collect information, sell either the raw data or a compiled dataset to another data broker (*e.g.*, Acxiom or Oracle), which data broker sells the information to

---

[34] *See* Steven Musil, *Facebook gave tech giants more access to users data than it said*, CBSNEWS (Dec. 19, 2018), https://www.cbsnews.com/news/facebook-gave-tech-giants-more-access-to-users-data-than-it-said-new-york-times/ (last visited Apr. 24, 2025); Steven Musil, *Facebook acknowledges it shared user data with dozens of companies* (Jul. 1, 2018), https://www.cnet.com/tech/tech-industry/facebook-acknowledges-it-shared-user-data-with-dozens-of-companies/ (last visited Apr. 24. 2025); Paresh Dave and Katie Paul, *Google secretly gave Facebook perks, data in ad deal* (Dec. 17, 2020), https://www.reuters.com/article/technology/google-secretly-gave-facebook-perks-data-in-ad-deal-us-states-allege-idUSKBN28Q37G/ (last visited Apr. 24, 2025).

[35] *See* Jessie G Taft, *Facebook and Google Are the New Data Brokers* (Dec. 18, 2018, updated Jan. 5, 2021), https://dli.tech.cornell.edu/post/facebook-and-google-are-the-new-data-brokers (last visited Apr. 24. 2025).

[36] *See* Kalev Leetaru, *The Data Brokers So Powerful Even Facebook Bought Their Data* (Apr. 05, 2018), https://www.forbes.com/sites/kalevleetaru/2018/04/05/the-data-brokers-so-powerful-even-facebook-bought-their-data-but-they-got-me-wildly-wrong/ (last visited Apr. 24. 2025).

[37] *See* Don Marti, *et. al.*, *Who Shares Your Information With Facebook?* at 16 (Jan. 2024), https://innovation.consumerreports.org/wp-content/uploads/2024/01/CR_Who-Shares-Your-Information-With-Facebook.pdf (explaining how Facebook uses aggregated data from external data brokers to target users on its platform).

[38] *Id.*

a fourth party (*e.g.*, Facebook), which uses the information for still other parties' targeted advertising.[39] In any event, the basic idea and results are the same. The Tracking Technologies track and disclose information to fourth parties that use that data and information to advertise a variety of products on a variety of platforms.

223. The information that data brokers like Acxiom and Oracle buy and compile from Tracking Technologies (like Facebook's and Google's Tracking Technologies) is inherently sensitive.

224. When advertisers use Google's real-time bidding system (RTB), for example, RTB lets hundreds of companies bid for ad space on individual consumers based on their Google profile, which can include information such as age, sex, and interests. While only one company will win the auction, hundreds of participating companies receive sensitive information about the potential recipient of the ad—device identifiers and cookies, web browsing and location data, IP addresses, and unique demographic information such as age and gender. Worse, many companies participating in the RTB system are not there to fill ad spaces but instead use RTB to collect users' personal data. Likewise, for users using cell phones or other Android devices that run on a Google operating system, every time they open an app on their Android phone or tablet, Google will timestamp it, and every ad the user is shown will be recorded and associated with their device profile.

225. Facebook is no better. Facebook has historically collaborated with data brokers to gather consumer data and enhance its user profiles for targeting advertising. Facebook itself acts as a first-party data broker, collecting data from user activities on its platform to offer targeted advertising, which is its primary revenue source. Facebook's data ecosystem extends through external partnerships, allowing Facebook to collect data from user interactions on other websites and apps. Companies that pay for ads on Facebook can then direct users to their websites, which embed trackers that collect information such as IP addresses and device IDs from visitors.

---

[39] *See* Kalev Leetaru, *The Data Brokers So Powerful Even Facebook Bought Their Data* (Apr. 05, 2018), https://www.forbes.com/sites/kalevleetaru/2018/04/05/the-data-brokers-so-powerful-even-facebook-bought-their-data-but-they-got-me-wildly-wrong/.

226. Facebook also has a history of sharing its customers data with third parties, including most infamously Cambridge Analytica, who gained access to the data of tens of millions of Facebook users. Facebook has also shared its customers data with "partners," such as Acxiom, Oracle, Epsilon, and Experian. Once this data is shared, neither Facebook nor its users have control over this data as it is endlessly sold and resold to data brokers around the world.

**N. Plaintiffs' Protected Health Information that Experity and GoHealth Collected, Disclosed, and Exploited is Plaintiffs' Property, Has Economic Value, and its Illicit Disclosure Caused Plaintiffs Harm.**

227. The value of data that Third Parties like Google and Facebook extract from people who use the Internet is well understood in the e-commerce industry.

228. In 2013, the Financial Times reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."40

229. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price." This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.

230. In June 2025, Google began soliciting individuals in the United States to purchase their computer and mobile phone internet browsing history for $540 a year per household participant.

231. Personal information is now viewed as a form of currency. Professor Paul M. Schwartz noted in the Harvard Law Review:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software

[40] https://ig.ft.com/how-much-is-your-personal-data-worth/

that facilitates the collection of consumer information.[41]

232. Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third-party data marketing companies because of the strict restrictions on disclosure of such information under state and federal laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[42]

233. Individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,[43] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[44]

234. Myriad other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[45]

235. Experity and GoHealth were compensated for their disclosures of Plaintiffs' and Class Members' PHI in the form of enhanced analytics and marketing services. Among other things, Experity used the analytics data that it received from Third Parties to enhance the Appointment Making Services product it marketed and sold to healthcare systems. In turn, healthcare companies like GoHealth used the Protected Health Information they received from Experity to sell advertising to other third parties, targeted to the patients whom Experity and GoHealth were supposedly serving and protecting from privacy violations.

//
//
//

---

[41] Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056-57 (2004).

[42] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*

[43] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-proununivciations-app

[44] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html

[45] https://www.creditdonkey.com/best-apps-data-collection.html; *see also* https://www.monetha.io/blog/rewards/earn-money-from-your-data/

236. Neither Experity nor GoHealth paid (or offered to pay) Plaintiffs and Class Members for their PHI before Experity and GoHealth shared this data with Google, Facebook, and other Third Parties.

237. Experity and GoHealth profited from Plaintiffs' and Class Members' information without ever intending to compensate Plaintiffs and Class Members or inform them that the disclosures had been made.

238. Experity and GoHealth were unjustly enriched by their conduct.

239. As a consequence of Experity's unauthorized disclosure of patients' PHI to Google, Facebook, and other Third Parties, Plaintiff and Class Members have further been harmed by their loss of control over their own PHI, which has now been shared with numerous data brokers participating in the online data market.

240. The only remedy for patients whose PHI has been shared with Google, Facebook, and other Third Parties is to use services such as DeleteMe and CyEx Privacy Shield Pro that go out into the online marketplace and "delete" patients' personal data from data broker rolls. These services, however, cost anywhere from $100 to $300 a year on average for consumers to try and regain control over their personal information.

**O. Plaintiffs and Class Members Have a Reasonable Expectation of Privacy in Their Protected Health Information.**

241. As patients using the Appointment Making Services, Plaintiffs and Class Members had a reasonable expectation that Experity and GoHealth would not disclose their PHI or the content of their communications to Third Parties without their express authorization.

242. Plaintiffs' and Class Members' reasonable expectations of privacy in their PHI and communications exchanged with Experity and GoHealth are derived from multiple sources, including at least:

- Experity's status as an Appointment Making Services provider and facilitator of Plaintiffs' and Class Members' healthcare;
- GoHealth's status as a healthcare provider;
- Experity's status as a business associate under HIPAA that performs services

or functions for a healthcare provider creating, receiving, maintaining, or transmitting PHI;

- GoHealth's status as a covered entity under HIPAA that provides healthcare-related services and, in doing so, creates, receives, maintains, and transmits PHI;
- Experity's and GoHealth's common law obligations to maintain the confidentiality of Sensitive Health Information and communications;
- State and federal laws and regulations protecting the confidentiality of PHI;
- State and federal laws protecting the confidentiality of communications and computer data; and
- State laws protecting against unauthorized use of personal means of identification.

243. It was reasonable for Plaintiffs and Class Members to assume that Experity's practices were consistent with Experity's duties to protect the confidentiality of patients' Sensitive Health Information.

244. It was likewise reasonable for Plaintiffs and Class Members to assume that GoHealth's practices were consistent with GoHealth's duties to protect the confidentiality of patients' Sensitive Health Information.

245. Indeed, multiple studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

246. Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

247. For example, a recent study by Consumer Reports showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites

should be required to provide consumers with a complete list of the data that has been collected about them.[46]

248. Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[47]

249. "Patients are highly sensitive to disclosure of their health information," particularly because it "often involves intimate and personal facts, with a heavy emotional overlay." Peter A. Winn, *Confidentiality in Cyberspace: The HIPAA Privacy Rules and the Common Law*, 33 RUTGERS L.J. 617, 621 (2002). Unsurprisingly, empirical evidence demonstrates that "[w]hen asked, the overwhelming majority of Americans express concern about the privacy of their medical records." Sharona Hoffman & Andy Podgurski, *E-Health Hazards: Provider Liability and Electronic Health Record Systems*, 24 BERKLEY TECH L.J. 1523, 1557 (2009).

250. The concern about sharing Sensitive Health Information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[48]

251. Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to Third Party companies like Facebook and Google. As those critics have pointed out, having a patient's personal Sensitive Health Information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to

[46] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/
[47] https://www.wired.co.uk/article/apple-ios14-facebook
[48] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

252. As a result of Experity's and GoHealth's disclosure of Plaintiffs' Sensitive Health Information to Third Parties without authorization via Tracking Technologies, Plaintiffs and Class Members have suffered the following injuries:

a. Loss of privacy;

b. Unauthorized disclosure of their Sensitive Health Information;

c. Unauthorized access of their Sensitive Health Information by Third Parties;

d. Defendants benefitted from the use of Plaintiffs and Class Members' Sensitive Health Information without sharing that information with Plaintiffs and Class Members;

e. Repeated targeted advertisements from third and fourth parties on social media and other websites, reflecting Plaintiffs' and Class Members' PHI that was improperly disclosed and used;

f. Lost benefit of their bargain with Experity and GoHealth, as Plaintiff and Class Members did not receive the reasonable privacy and data security protections for which they paid;

g. Defendants enriched themselves at Plaintiffs' and Class Members' expense without sharing the revenue and profit attributable to collecting their Sensitive Health Information without authorization and sharing it with Third Parties (and fourth parties);

h. Defendants profited off of disclosing Plaintiffs' and Class Members' Sensitive Health Information without authorization and sharing it with Third Parties (and fourth parties) through savings in marketing costs;

i. Defendants profited as a result of collecting Plaintiffs' and Class Members' Sensitive Health Information without authorization and sharing it with Third Parties (and fourth parties) through their revenues and profits attributable to serving and monetizing advertisements directed to Plaintiffs and Class Members;

j. Plaintiffs and Class Members lost their ability to keep their Sensitive Health Information private or allow Experity and GoHealth to track their data;

k. Plaintiffs and Class Members cannot remediate the privacy harms they have suffered without many hours of work and spending hundreds of

dollars a year to pay for third-party services to scrub their Sensitive Health Information from data broker rolls;

l. Embarrassment, humiliation, frustration, and emotional distress;

m. Decreased value of their Sensitive Health Information;

n. Increased risk of future harm resulting from future use and disclosure of their Sensitive Health Information; and

o. Statutory damages.

**P. Plaintiffs' and Class Members' Protected Health Information is Protected Against Unauthorized Disclosure by Both State and Federal Law.**

253. The confidentiality of Plaintiffs' and Class Members' PHI is specifically protected by law. *E.g.*, 45 C.F.R. § 164.514. The prohibitions against disclosing PHI include prohibitions against disclosing personally identifiable information such as patient names, IP addresses, and other unique characteristics or codes. *E.g.*, 45 C.F.R. § 164.51. Both state and federal law also restrict the use of Plaintiffs' and Class Members' PHI, including their status as patients, to only those uses related to their care unless patients have provided express written authorization to the contrary.

254. Neither Experity nor GoHealth has a legal right to share Plaintiffs' and Class Members' PHI with third parties without their written consent because this information is protected from such disclosure by law. 45 C.F.R. § 164.508.

255. Experity and Gohealth are not permitted to disclose Plaintiffs' and Class Members' PHI to Third Party advertising and marketing companies like Google without express written authorization from patients. *E.g.*, 45 C.F.R. § 164.502(a)(5)(ii).

256. Indeed, as discussed above, HHS recently confirmed that hospitals are prohibited from transmitting Health Information via Tracking Technologies like Google Analytics or the Meta Pixel without a patient's authorization and other protections like a business associate agreement with the recipient of the PHI.

257. Among other things, HHS warned healthcare providers like GoHealth that: "Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of Health Information to tracking technology vendors or any other

violations of the HIPAA Rules. For example, disclosures of Health Information to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[49]

258. GoHealth failed to obtain a valid written authorization from Plaintiffs or Class Members to allow the capture and exploitation of their Protected Health Information and the contents of their communications for marketing purposes.

259. Plaintiffs' and Class Members' PHI is protected by federal law under HIPAA and its implementing regulations, which are promulgated by HHS.

260. The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[50]

261. Business associates like Experity, which function as Business Associates, must also comply with the privacy obligations imposed by HIPAA.[51]

262. The Privacy Rule broadly defines "protected health information" as "individually identifiable health information" ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. §160.103; *see* n.1, *supra*.

263. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3)

---

[49] https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html

[50] Department of Health and Human Services, *Health Information Privacy* (Mar. 31, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

[51] 78 Fed. Reg. 5568 (2013) (extending certain HIPAA Privacy and Security Rules, like those described here, to business associates).

either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. §160.103.

264. Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

> A. Names;
>
> . . .
>
> H. Medical records numbers;
>
> . . .
>
> J. Account numbers;
>
> . . .
>
> M. Device identifiers and serial numbers;
>
> N. Web Universal Resource Locators (URLs);
>
> O. Internet Protocol (IP) address numbers; … and
> R. Any other unique identifying number, characteristics, or code…; and"
>
> the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 164.514.

265. The HIPAA Privacy rule requires covered entities and business associates to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

//
//

266. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

267. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

268. Courts have recognized that patient status is protected by HIPAA. *E.g.*, *In re Meta Pixel Healthcare Lit.*, Case No. 3:22-cv-03580-WHO, Dkt. 159 at 12 (N.D. Cal. Dec. 22, 2022) ("I agree that the information at issue here appears to show patient status and thus constitutes protected health information under HIPAA."); *id.* at 15 ("[T]he Pixel captures information that connects a particular user to a particular health care provider – i.e., patient status – which falls within the ambit of information protected under HIPAA.").

269. Guidance from HHS confirms that patient status is protected by HIPAA:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data. … **If such information was listed with health condition, health care provision** or payment data, **such as an indication that the individual was treated at a certain clinic**, then this information would be PHI.[52]

[52] Office for Civil Rights, Department of Health and Human Services, *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule* at 5 (emphasis added) (Nov. 26, 2012), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf .

270. In December 2022, HHS issued a Bulletin "to highlight the obligations" of health care providers and their business associates under the HIPAA Privacy Rule "when using online tracking technologies" such as the "Meta Pixel," which "collect and analyze information about how internet users are interacting with a regulated entity's website or mobile application."[53]

271. In the Bulletin, which was amended in June 2024, HHS explained that tracking technologies on password-protected patient portals "generally have access to PHI" and may access diagnosis and treatment information, in addition to other sensitive data:

> Regulated entities may have user-authenticated webpages, which require a user to log in before they are able to access the webpage, such as a patient or health plan beneficiary portal or a telehealth platform. **Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI.** Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage. **Tracking technologies within user-authenticated webpages may even have access to an individual's diagnosis and treatment information, prescription information, billing information, or other information within the portal**. Therefore, a regulated entity must configure any user-authenticated webpages that include tracking technologies to allow such technologies to **only** use and disclose PHI in compliance with the HIPAA Privacy Rule and must ensure that the electronic protected health information (ePHI) collected through its website is protected and secured in accordance with the HIPAA Security Rule.[54]

272. The HHS Guidance further explained that tracking technology vendors like Google are considered business associates under HIPAA and that entities who use their services must obtain a business associate agreement ("BAA") before utilizing their services:[55]

> [T]racking technology vendors are business associates if they

---

[53] Office of Civil Rights, Department of Health and Human Services, HHS Office of Civil Rights Issue Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information (Dec. 1, 2022), https://www.hhs.gov/about/news/2022/12/01/hhs-office-for-civil-rights-issues-bulletin-on-requirements-under-hipaa-for-online-tracking-technologies.html.

[54] Office of Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last reviewed June 26, 2024) (emphasis added).

[55] On June 20, 2024, in *American Hospital Association, et al. v. Xavier Becerra, et al.*, Case No. 4:23-cv-01110-P (N.D. Tx., Jun. 20, 2024, Doc. 67), the U.S. District Court for the Northern District of Texas vacated HHS's March 14, 2024 Bulletin as to the "Proscribed Combination," *but* acknowledged that the Proscribed Combination could be PHI in certain circumstances.

> create, receive, maintain, or transmit PHI on behalf of a regulated entity for a covered function (*e.g.* health care operations) or provide certain services to or for a covered entity (or another business associate) that involve the disclosure of PHI. In these circumstances, regulated entities must ensure that the disclosures made to such vendors are permitted by the Privacy Rule and enter into a business associate agreement (BAA) with these tracking technology vendors to ensure that PHI is protected in accordance with the HIPAA Rules. For example, if an individual makes an appointment through the website of a covered health clinic for health services and that website uses third party tracking technologies, then the website might automatically transmit information regarding the appointment and the individual's IP address to a tracking technology vendor. In this case, the tracking technology vendor is a business associate and a BAA is required.[56]

273. HHS reiterated that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of HIPAA Rules."[57]

274. As HHS explained, an "impermissible disclosure" of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms:

275. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.[58]

## TOLLING, CONCEALMENT, AND ESTOPPEL

276. The applicable statutes of limitation have been tolled because of Experity's and GoHealth's knowing and active concealment and denial of the facts alleged herein.

277. Defendants seamlessly incorporated Tracking Technologies into the websites offering the Appointment Making Services, providing no indication to Plaintiffs or Class Members that their PHI and PII were being disclosed and that they were being tracked for marketing purposes.

---

[56] *Id.*
[57] *Id.*
[58] *Id.*

Defendants intentionally concealed that, by interacting with the Appointment Making Services, Plaintiffs' and Class Members' PHI and PII would be intercepted, collected, used by, and disclosed to Third Parties. Defendants' fraudulent concealment of their efforts to share PHI and PII with Third Parties (including information that specifically identified patients' real-world identities) violated the duties that Defendants owed Plaintiffs and Class Members, tolling the statute of limitations.

278. Plaintiffs and Class Members could not, with due diligence, discover the full scope of Defendants' conduct, because there were no disclosures or other indication that they were interacting with Appointment Making Services that employed Google Analytics and other Tracking Technologies.

279. The earliest Plaintiffs and Class Members could have known about Defendants' conduct was approximately in January and March 2026, when Plaintiffs contacted the undersigned counsel to discuss their potential claims against Defendants.

280. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Additionally, Defendants were under a duty to disclose the nature and significance of its data collection practices but did not do so. Defendants are therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

281. Plaintiffs re-allege and incorporate by reference the allegations set forth above.

282. Plaintiffs bring this action as a nationwide class action pursuant to Rules 23(a), 23(b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class:

> **The Nationwide Class:** During the fullest period allowable by law, all patients in the United States who made appoints via the Experity Appointment Making Services where Google Analytics or similar third-party tracking code was deployed.
>
> **The California Class:** During the fullest period allowable by law, all California citizens who made appointments via the Experity Appointment Making Services where Google Analytics or similar third-party analytics code was deployed.
>
> **The Illinois Class**: During the fullest period allowable by law, all Illinois citizens who made appointments via the Experity Appointment Making Services where Google Analytics or similar third-party analytics code was deployed.

283. Excluded from the Class are Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; and the Court staff assigned to this case and their immediate family members. Plaintiffs reserve the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

284. This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

285. **Numerosity—Federal Rule of Civil Procedure 23(a)(1)** – Class Members are so numerous that their individual joinder is impracticable. The precise number of Class Members and their identities are unknown to Plaintiffs at this time but will be determined through discovery through the records of Defendants.

286. **Commonality and Predominance—Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3)** – Common questions of law and fact exist and predominate over questions affecting only individual Class Members. These common legal and factual questions include the following:

a. Whether Defendants' practices relating to disclosures of Plaintiffs' and Class Members' Sensitive Health Information to third parties were intentional;

b. Whether Defendants profited from disclosures to the third parties;

c. Whether Defendants intentionally violated HIPAA by deploying tracking technologies on its websites despite its knowledge that such technologies illegally disclosed PHI to Third Parties;

d. Whether Defendants' conduct violates the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.* and 18 U.S.C. § 2701, *et seq.*;

e. Whether Defendants' practices constitute an unauthorized intrusion upon seclusion;

f. Whether Defendants' practices constitute identity theft;

g. Whether Defendants' practices constitute a breach of fiduciary duty;

h. Whether Defendants' practices constitute tampering with computer data;

i. Whether Defendants' practices constitute unjust enrichment;

j. Whether placement of the Google cookies disguised as belonging to

Defendants on Plaintiffs' and Class Members' computing devices is a highly offensive intrusion upon seclusion;

k. Whether Defendants' conduct harmed and continues to harm Plaintiffs and Class Members, and if so, the extent of the injury;

l. Whether and to what extent Plaintiffs and Class Members are entitled to damages and other monetary relief;

m. Whether and to what extent Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction; and

n. Whether and to what extent Plaintiffs and Class Members are entitled to attorneys' fees and costs.

287. **Typicality—Federal Rule of Civil Procedure 23(a)(3)** – Plaintiffs' claims are typical of the claims of the Class and Plaintiffs have substantially the same interest in this matter as other Class Members. Plaintiffs have no interests that are antagonistic to, or in conflict with, the interests of the other Class Members. Plaintiffs' claims arise out of the same set of facts and conduct as all other Class Members. Plaintiffs and all Class Members are patients who used the Appointment Making Services and are victims of Defendants' unauthorized disclosures to Third Parties. All Plaintiffs' and Class Members' claims are based on Defendants' wrongful conduct and unauthorized disclosures.

288. **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4)** – Plaintiffs will fairly and adequately protect the interests of Class Members. Plaintiffs have retained competent counsel experienced in complex class action privacy litigation and Plaintiffs will prosecute this action vigorously. Plaintiffs have no interests adverse or antagonistic to those of the Class.

289. **Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2)** – Defendants acted or refused to act on grounds generally applicable to Plaintiffs and the other Class Members, thereby making appropriate final injunctive relief and/or declaratory relief, as described below.

290. **Superiority—Federal Rule of Civil Procedure 23(b)(3)** – A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for the Class Members, on an individual basis, to obtain effective redress for the wrongs done them. Furthermore, even if Class Members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

291. Additionally, the Class may be certified under Rule 23(b)(1) or (b)(2) because:

a. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendants;

b. The prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c. Defendants haveacted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class Members as a whole.

**COUNT I**
**Violation of the Electronic Communications Privacy Act**

**18 U.S.C. § 2511(1) et seq.**
**Unauthorized Interception, Use, and Disclosure**
**Against Experity and GoHealth**
***(On behalf of Plaintiffs and the Nationwide Class)***

292. Plaintiffs repeat and reallege the foregoing paragraphs as if fully alleged herein.

293. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

294. Title I of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510, also known as the Wiretap Act, provides a private cause of action against any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

295. The ECPA protects individuals against eavesdropping committed with an improper purpose.

296. Plaintiffs' and Class Members' communications via Appointment Making Services, including their communications with their treating physicians, are covered communications under the ECPA.

297. The ECPA protects both the sending and receipt of electronic communications.

298. The ECPA provides a private right of action to any person whose electronic communications are "intercepted, disclosed, or intentionally used" in violation of the ECPA.

299. "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

300. The transmissions of data between Plaintiffs and Class Members, on the one hand, and their healthcare providers via the Appointment Making Services, which are hosted by Experity, on the other, qualify as communications under the ECPA.

301. "Intercept" under the ECPA means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

302. "Contents" includes "*any* information relating to the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8) (emphasis added).

303. The "contents" of Plaintiffs' and Class Members' electronic communications included at least:

a. the parties to the communications;

b. the precise text of their search queries;

c. personally identifiable information such as their IP addresses, Google IDs, browser fingerprints, and other unique identifiers;

d. the precise text of their communications about specific doctors;

e. the precise text of their communications about specific medical conditions;

f. the precise text of their communications about specific treatments;

g. the precise text of their communications about scheduling appointments with medical providers;

h. the precise text of their communications about billing and payment;

i. information that is a general summary or informs third parties of the general subject of communications that Experity and GoHealth sent back to them in response to requests for information about specific doctors, conditions, treatments, and other information; and

j. any other content that Experity has aided third parties in scraping from webpages or communication forms in the Appointment Making Services.

304. Plaintiffs' and Class Members' communications using the Appointment Making Servicesconstitute "electronic communications" because they were wholly or partially transmitted by wire, electromagnetic, and/or photoelectronic systems including, but not limited to:

a. Plaintiffs' and Class Members' personal computing devices;

b. Plaintiffs' and Class Members' web browsers;

c. Plaintiffs' and Class Members' browser-managed files;

d. Plaintiffs' and Class Members' mobile phone browsers;

e. Google Analytics;

f. Internet cookies;

g. Experity's computer servers;

h. GoHealth's computer servers;

i. Third-party source code used by GoHealth; and

j. Third-party source code used by Experity.

305. Experity violated the Electronic Communications Privacy Act, 18 U.S.C. § 2511, by directly intercepting Plaintiffs' and Class Members' electronic communications through its own Tracking Technologies, knowing those technologies would capture and transmit the communications.

306. GoHealth violated the Electronic Communications Privacy Act, 18 U.S.C. § 2511, by intercepting and subsequently disclosing Plaintiffs' and Class Members' electronic communications via the deployment of its own Tracking Technologies, including Google Analytics.

307. Whenever Plaintiffs and Class Members interacted with the Appointment Making Services, Experity and GoHealth, through the Tracking Technologies they embedded and ran on the Appointment Making Services, intentionally intercepted and divulged the contents of Plaintiffs' and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, *i.e.*, Google and other Third Parties.

308. Without Plaintiffs' and Class Members' knowledge or consent, Experity and GoHealth acquired the content of Plaintiffs' and Class Members' communications while they were still exchanging communications with their healthcare providers inside the Appointment Making Services. Experity and GoHealth then caused these same communications to be disclosed to Google and other Third Parties in return for marketing and advertising benefits.

309. Experity also assisted its customers, including GoHealth, with placing their own Google Tag Manager source code on the Appointment Making Services, with the result that additional third parties, including Facebook, routinely received PHI relating to patient appointments.

310. In violation of 42 U.S.C. § 1320d-6, Experity and GoHealth knowingly disclosed "individually identifiable health information to another person"—*i.e.*, Google, New Relic, and other Third Parties. As set forth more fully throughout this Complaint, Defendants' disclosures of patients' Protected Health Information were "knowing" because, among other things:

a. Defendants deliberately chose to deploy Tracking Technologies on the Appointment Making Services knowing they contained PHI.

b. Defendants knew that by deploying Tracking Technologies on the Appointment Making Services they were permitting Third Parties to collect, use, and share Plaintiffs' and the Class Members' PHI, including sensitive medical information and personally identifiable data.

c. Google warns web developers that Google Analytics is not appropriate for health-related webpages and websites. Indeed, Google warns web developers that "Health" is a prohibited category that should be used by advertisers to target ads to users or promote advertisers' products or services. Defendants either knew or should have known of these warnings from Google, and despite the warnings deployed Google Analytics in its Appointment Making Services.

d. HHS and other government authorities have also warned that Tracking Technologies are not appropriate for health-related webpages and

websites, and expressly warned that they can disclose PHI in violation of HIPAA and other applicable laws. Defendants either knew or should have known of these warnings, and despite the warnings deployed Tracking Technologies in the Appointment Making Services.

e. Defendants intentionally concealed their use of Tracking Technologies from the public, suggesting Defendants knew what they were doing was illegal.

f. Defendants accessed, obtained, and disclosed Plaintiffs' and Class Members' PHI for the purpose of committing the crimes and torts described in detail in this complaint.

311. Defendants further violated 42 U.S.C. § 1320d-6 by intentionally disclosing Plaintiffs' and Class Members' PHI to Third Parties for the purpose of obtaining "commercial advantage" over their rivals in the marketplace. Specifically, Defendants shared Plaintiffs' and Class Members' PHI with Google and other Third Parties in return for free advertising and marketing tools, along with aggregated patient data, that Defendants used to optimize the Appointment Making Services and their marketing campaigns, so that Defendants could increase profitability and the ROI on marketing and advertising spend. By exploiting Plaintiffs' and Class Members' PHI in this manner, Defendants hoped to take market share away from their business rivals in the online healthcare services market.

312. Google, Facebook, and other Third Parties, in turn, used the PHI they received from Defendants and their clients to sell targeted advertising to other third parties. While that bargain may have enriched Google, Facebook, and Defendants, it came at the expense of Plaintiffs and Class Members.

313. For example, when a patient makes contact with the Appointment Making Services to exchange communications with his or her health care provider, a "TLS handshake" occurs that opens a line between the patient's communications device and Experity's servers. The line remains open and communications continue to flow back and forth from the patient's communications device and the servers. The patient's communications with his or her healthcare provider flow

through this open line. At the same time that the line is open and communications remain "in transit" between the patient's communications device and Experity's server, Experity also placed the content of the communication in temporary electronic storage and long-term storage, rendering a communication in transit, electronic storage, and storage all at the same time.

314. Experity was not a party to the communications that it intercepted and disclosed. When Plaintiffs and Class Members booked appointments via the Appointment Making Services they were not communicating with Experity. Rather, Plaintiffs and Class Members were communicating directly with their health care providers, such as GoHealth, without any knowledge that Experity was secretly intercepting and recording their communications and then disclosing them to Google and other Third Parties.

315. Defendants' conduct occurred through the use of "devices" within the meaning of the ECPA, 18 U.S.C. § 2510(5), including:

a. Cookies, including Google and other Third Party cookies disguised as cookies belonging to Experity or GoHealth;

b. Healthcare providers' web servers;

c. Third Parties' web servers;

d. Experity's web servers;

e. GoHealth's web servers; and

f. The Tracking Technology source code described herein.

316. Neither Experity nor the Third Parties were parties to Plaintiffs' and Class Members' communications with their healthcare providers.

317. Nor does the party exception in 18 U.S.C. § 2511(2)(d) apply to Defendants. The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Therefore Defendants GoHealth and Experity (assuming that Experity is found to be a party to the communications) are still liable under the ECPA because they acted with the purpose of committing criminal and tortious acts in violation of federal and state laws, including but not limited to:

a. A criminal violation of 42 U.S.C. § 1320d-6 regardless of any subsequent purpose or use of the individually identifiable health data; and

b. A violation of HIPAA, particularly 42 U.S.C. § 1320d-6, which is a criminal offense punishable by fine or imprisonment with increased penalties where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage [or] personal gain."

c. A knowing breach of Defendants' common law and fiduciary duties to Plaintiffs and Class Members.

318. Defendants accessed and obtained Plaintiffs' and Class Members' PHI for the purpose of committing the crimes and torts described herein. More specifically, Defendants intercepted Plaintiffs' and Class Members' communications (and in turn assisted its clients in doing the same) so that Defendants could share those communications with Google, Facebook, and other Third Parties in return for advertising and marketing benefits. This intended and intentional disclosure violated both federal and state laws as set out above.

319. Defendants would not have been able to obtain these advertising or marketing services if they had complied with those laws. Moreover, Defendants knew that their conduct was illegal under those laws.

320. On information and belief, Defendants' own internal (*i.e.*, non-public) policies expressly recognized and acknowledged that it violates HIPAA to disclose patient health information to third parties in conjunction with identifiers such as IP addresses, URLs, medical record numbers, and other identifiers. Despite these internal policies, Defendants nevertheless shared such information with Google via Tracking Technologies for the purpose of surreptitiously violating HIPAA and other applicable laws without patients' knowledge or consent.

321. Defendants acted without the consent of Plaintiffs' or Class Members' healthcare providers.

322. Although Plaintiffs and Class Members consented to Defendants acquiring their PHI for purposes of facilitating their medical care, Plaintiffs and Class Members did not consent to Defendants acquiring their PHI for purposes of re-directing it to Google and other Third Parties so that those companies could exploit their PHI for marketing and advertising purposes.

323. As such, Defendants cannot claim any exception to ECPA liability.

324. As a direct and proximate result of Defendants' violation of the ECPA, Plaintiffs and Class Members were damaged by Defendants' conduct in, at minimum, the following ways:

a. Defendants harmed Plaintiffs' and Class Members' interest in privacy;

b. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is private no longer;

c. Plaintiffs and Class Members cannot remediate the privacy harms they have suffered without spending hundreds of dollars a year to pay for third-party services to scrub their PHI from data broker rolls;

d. Defendants eroded the essential confidential nature of the provider-patient relationship;

e. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' authorization, informed consent, or knowledge, and without sharing the benefit;

f. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included their healthcare providers' duty to maintain confidentiality; and

g. Defendants' actions diminished the value of Plaintiffs and Class Members' PHI.

325. In violating the ECPA, Defendants' conduct was a knowing, conscious, and deliberate wrongdoing, and carried out with an evil or wrongful motive, an intent to injure Plaintiff, and a recklessly negligent or callous indifference to Plaintiffs' and Class Members' protected rights under both state and federal law.

326. For example, Defendants were specifically warned by Google that placing Google Analytics on a health-related website such as the appointment making websites that they offered would result in PHI being shared with Google in violation of HIPAA.

327. Defendants were also warned by HHS that placing tracking technologies on a health-related website like the appointment making websites offered by Defendants would result in HIPAA violations.

328. Despite being fully aware that deploying Google Analytics on the Appointment Making Services would result in criminal HIPAA violations, Defendants nevertheless routinely deployed Google Analytics on their websites.

329. Experity also aided and abetted the installation of Tracking Technologies for its healthcare clients, including GoHealth.

330. Worse, not only were Defendants aware that deploying such Tracking Technologies was illegal under HIPAA, Defendants also knew at the time they deployed the technologies that embedding Google Analytics on websites would result in vast quantities' of patients' health data being shared with Google because that is what those technologies are specifically designed to do.

331. Indeed, Defendants not only intentionally harmed Plaintiffs and Class Members without just cause but also acted with a deliberate and flagrant disregard for their safety and privacy. Specifically:

a. Defendants knew they had a duty to safeguard and keep confidential Plaintiffs' and Class Members' PHI under HIPAA and other applicable laws;

b. Defendants knew that Plaintiffs and Class Members reasonably expected their communications with healthcare providers to remain private;

c. Defendants knew that Plaintiffs' and Class Members' communications involved private and sensitive matters concerning Plaintiffs' and Class Members' healthcare;

d. Defendants knew they were prohibited by law from intercepting and disclosing Plaintiffs' and Class Members' communications;

e. Defendants knew that Google, Facebook, and other Third Parties used the Sensitive Health Information that they were receiving for marketing purposes;

f. Experity knew that it was required to sign a business associate agreement with any Tracking Technology vendor with whom Experity was sharing patients' PHI;

g. Defendants knew that their use of the Tracking Technologies at issue violated its duties under HIPAA and other applicable laws, among other things as set forth in the December 2022 HHS Bulletin;

h. Defendants nonetheless knowingly and deliberately intercepted and disclosed to Third Party advertisers Plaintiffs' and Class Members' PHI without Plaintiffs' or Class Members' consent, in a knowing violation of HIPAA, the ECPA, and other laws;

i. Worse, Defendants intentionally concealed the fact that there was Google Analytics tracking technology on the website from the public;

j. Defendants also intentionally concealed from the public the fact that, every time patients made an appointment, their appointment data was shared with Google for marketing purposes;

k. Defendants carried out their unlawful conduct with the wrongful and evil motive to appropriate Plaintiffs' and Class Members' private PHI at Plaintiffs' and Class Members' expense and for their own financial gain; and

l. Defendants' conduct was particularly egregious and reprehensible because they acquired Plaintiffs' and Class Members' PHI under the guise of offering healthcare services to Plaintiffs and Class Members.

332. While not an element of Plaintiffs' and Class Members' wiretap claim, based on the facts specifically identified the above paragraph, as well as the factual allegations contained elsewhere in this Complaint, a jury could reasonably conclude that Defendants intentionally and

purposefully set out to violate HIPAA when they decided to deploy surreptitious tracking technologies on the Appointment Making Services.

333. The ECPA provides that persons whose electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119 may recover statutory damages of the greater of $100 a day for each day of violation or $10,000. 18 U.S.C. § 2520.

334. The harm being suffered by Plaintiffs and Class Members is ongoing because—as of the time of the filing of this Complaint—Defendants and Experity's other clients continue to deploy the tracking technologies described in this complaint on websites providing the Appointment Making Services.

335. Plaintiffs, individually and on behalf of the Class Members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

**COUNT II**
**Violation of the California Invasion of Privacy Act ("CIPA")**
**Cal. Penal Code §§ 630, *et seq.***
**Against Experity and GoHealth**
***(On behalf of the Doe Plaintiffs and the California Class)***

336. Plaintiffs re-allege and incorporate all preceding paragraphs.

337. Plaintiffs bring this claim on behalf of themselves and the California Class.

338. The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.* ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

339. Individuals, businesses, and other legal entities violate § 631(a) if they "aid[], agree[] with, employ[], or conspire[] with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph.

340. CAL. PENAL CODE § 632(a) generally prohibits individuals, businesses, and other legal entities from recording confidential communications without consent of all parties to the communication.

341. All alleged communications between Plaintiffs or Class Members and Defendants qualify as protected communications under CIPA because each communication is made using personal computing devices (*e.g.*, computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

342. Experity and GoHealth used recording devices to record the confidential communications without the consent of Plaintiffs or Class members and then transmitted such information to Third Parties, including Google.

343. At all relevant times, aided, agreed with, and conspired with third parties, including, GoHealth and other of their healthcare clients, to track and intercept Plaintiffs' and Class Members' internet communications. These communications were intercepted without the authorization and consent of Plaintiffs and Class Members.

344. Experity engaged in and continues to engage in interception by aiding Third Parties (including Facebook, Google, and Experity's clients, including GoHealth) to secretly record the contents of Plaintiffs' and Class Members' wire communications.

345. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, Google Analytics Pixel fall under the broad catch-all category of "any other manner":

(a) Plaintiffs' and Class Members' personal computing devices;

(b) Plaintiffs' and Class Members' web browsers;

(c) Plaintiffs' and Class Members' browser-managed files;

(d) The Google Analytics Pixel;

(e) Other Tracking Technology source code;

(f) Internet cookies;

(g) Experity's computer servers;

(h) Other third-party source code utilized by Experity; and

(i) Computer servers of Third Parties (including Google) to which Plaintiffs' and Class Members' communications were disclosed.

346. Experity aided in, and continues to aid in, the interception of contents in that the data from the communications between Plaintiffs and/or Class Members and Experity's healthcare clients, including GoHealth, that were redirected to and recorded by the Third Parties include information which identifies the parties to each communication, their existence, and their contents.

347. Experity aided in the interception of "contents" in at least the following forms:

(a) The parties to the communications;

(b) Personally identifying information such as patients' IP addresses, cookie IDs, , browser fingerprints, and other unique identifiers;

(c) Communications about specific medical conditions;

(d) Communications about specific treatments;

(e) The specific reservation code assigned to each patient's appointment;

(f) The specific facility associated with each patient appointment;

(g) Communications about scheduling appointments with medical providers;

(h) The precise text of specific buttons that patients click to exchange communications, including Registrations, Requests for Appointments, Search, and other buttons;

(i) The precise dates and times when patients click to access Experity's website(s);

(j) The precise dates and times when patients visit Experity's websites; and

(k) Any other content that Experity has aided Third Parties in scraping from webpages or communication forms in the Appointment Making Services.

348. Experity gave substantial assistance to its healthcare clients, including GoHealth, and other Third Parties in violating the privacy rights of Plaintiffs and Class Members.

349. Experity and GoHealth knew that the installation of tracking technologies on the Appointment Making Services would result in the unauthorized disclosure of patients' communications to Google and other Third Parties, yet nevertheless did so anyway.

350. Plaintiffs' and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their PHI, including using their sensitive medical information to develop marketing and advertising strategies.

351. Plaintiffs and the Class Members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

352. In addition to statutory damages, Experity's and GoHealth's breaches caused Plaintiffs and Class Members, at minimum, the following damages:

(a) Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

(b) Experity eroded the essential confidential nature of the doctor-patient relationship;

(c) Plaintiff and Class Members cannot remediate the privacy harms they have suffered without expending many hours and spending hundreds of dollars a year to pay for third-party services to scrub their PHI from data broker rolls;

(d) Experity took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

(e) Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Experity's duty to maintain confidentiality; and

(f) Experity's and GoHealth's actions diminished the value of Plaintiffs' and Class Members' personal information.

353. Plaintiffs and Class Members have also suffered irreparable injury from Experity's and GoHelath's unauthorized acts of disclosure. Their personal, private, and sensitive data has been collected, viewed, accessed, stored, and used by Experity, GoHealth, Google, and other Third Parties without their consent and has not been destroyed.

354. Plaintiffs and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

355. Plaintiffs continue to desire to use the Appointment Making Services to communicate with their healthcare providers, book appointments, and use the other functionality they provide.

356. Plaintiffs will continue to suffer harm if the Appointment Making Services are not redesigned. If the Appointment Making Services were redesigned to comply with applicable laws, Plaintiffs would use the Appointment Making Services in the future.

357. Due to the continuing threat of injury, Plaintiffs and Class Members have no adequate remedy at law, and Plaintiffs and Class Members are therefore entitled to injunctive relief.

358. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT III**
**Invasion of Privacy and Violation of the California Constitution, Art. 1, § 1**
**Against Experity and GoHealth**
***(On behalf of the Doe Plaintiffs and the California Class)***

359. Plaintiffs re-allege and incorporate all preceding paragraphs.

360. Plaintiffs bring this claim on behalf of themselves and the California Class Member.

361. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

362. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and

(3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of social norms.

363. The right to privacy in California's constitution creates a right of action against private and government entities.

364. Plaintiffs and Class Members have and continue to have a reasonable expectation of privacy in their PHI, personal information, identities, and user data pursuant to Article I, Section I of the California Constitution.

365. Plaintiffs and Class Members had a reasonable expectation of privacy under the circumstances, including that: (i) the data collected, used, and disclosed by Defendants included personal, sensitive medical information, decisions, and medical diagnoses; and (ii) Plaintiffs and Class Members did not consent or otherwise authorize Defendants to disclose this information to others or to collect and use this private information for their own monetary gain.

366. Given the nature of the Sensitive Health Information that Defendants disclosed to Google and other Third Parties, such as patients' names, information entered into forms, doctor's names, potential doctor's names, and details about upcoming doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

367. The disclosure of PII and PHI constitutes an unreasonable, substantial, and serious interference with Plaintiffs' and Class Members' rights to privacy.

368. Plaintiffs and Class Members did not consent to, authorize, or know about Defendants' disclosure of their Sensitive Health Information to Facebook, Google, and other Third Parties at the time it occurred. Plaintiffs and Class Members never agreed that their sensitive medical information could be collected, used, and monetized by Facebook, Google, and other Third Parties.

369. Plaintiffs and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights. Plaintiffs continue to desire to search for health information on yhr Appointment Making Services. They will continue to suffer harm if the Appointment Making Services are not redesigned. If the Appointment Making Services were

redesigned to comply with applicable laws, Plaintiffs would use them to search for health information in the future.

370. Plaintiffs and Class Members therefore seek injunctive relief to prevent Defendants from continuing to collect, use, and sell PHI without consent.

371. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendants' invasion of their privacy and are entitled to seek just compensation, including monetary damages.

372. Plaintiffs and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendants as a result of their intrusions on Plaintiffs' and Class Members' privacy.

373. Defendants' breach caused Plaintiffs and Class Members, at minimum, the following damages:

(a) Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

(b) Defendants eroded the essential confidential nature of the doctor-patient relationship;

(c) Plaintiff and Class Members cannot remediate the privacy harms they have suffered without expending many hours and spending hundreds of dollars a year to pay for third-party services to scrub their PHI from data broker rolls;

(d) Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

(e) Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendants' duty to maintain confidentiality; and

(f) Defendants' actions diminished the value of Plaintiffs' and Class Members' personal information.

374. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendants' actions, which caused injury to Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

375. Plaintiffs and Class Members seek attorney's fees in accordance with Cal. Civ. Proc. Code § 1021.5.

376. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT IV**
**Violations of Cal. Civil Code §§ 1709 & 1710**
**Against Experity and GoHealth**
***(On behalf of the Doe Plaintiffs and the California Class)***

377. Plaintiffs re-allege and incorporate all preceding paragraphs.

378. Plaintiffs bring this claim on behalf of themselves and the California Class Members.

379. California Civil Code § 1709 provides that "[o]ne who willfully deceives another with intend to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

380. California Civil Code § 1710 defines "deceit" as (1) the suggestion, as a fact, of that which is not true, by one who does not believe it to be true; (2) the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; (3) the suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or (4) a promise, made without any intention of performing it.

381. Throughout the class period, Defendants engaged in deceit by intentionally concealing and failing to disclose the true nature of the Appointment Making Services and conduct to users of Defendants' websites. Defendants knew that representations made within their privacy notices were misleading and material and that the facts Defendants failed to disclose were material.

382. Defendants owed a duty to Plaintiffs and Class Members to provide them material information about its acquisition and use of the PHI that Defendants invited them to share through the Appointment Making Services. Defendants' omissions and nondisclosures described herein were likely to deceive reasonable consumers, and have deceived Plaintiffs and Class Members.

383. Defendants' omissions and nondisclosures were pervasive. Plaintiffs and Class Members reasonably relied on the material omissions and nondisclosures by Defendants.

384. Defendants' misconduct alleged herein was intentional, deliberate, and willful, and was perpetrated with the intent to, inter alia, cause Plaintiffs and Class Members unknowingly to divulge PHI of Plaintiffs and California Class members with the intent to induce them to alter their position to their injury or risk under Cal. Civ. Code § 1709.

385. Plaintiffs seek recovery of their and the Class Members' resulting damages, including economic damages, restitution, and disgorgement, as well as punitive damages.

**COUNT V**
**Violation of the CIPA, Cal. Penal Code § 638.51**
**Against Experity and GoHealth**
***(On behalf of the Doe Plaintiffs and the California Class)***

386. Plaintiffs re-allege and incorporate all preceding paragraphs.

387. Plaintiffs bring this claim on behalf of themselves and all members of the California Class.

388. Defendants installed and used pen registers and/or trap and trace devices on its websites without a court order in violation of Cal. Penal Code § 638.51. Specifically, Defendants deployed the Google Analytics pixel on their websites, which recorded and captured Plaintiffs' and Class Members IP addresses, first and third-party cookie data, and device and browser configuration, including geo-location information, when Plaintiffs and Class Members took actions such as logging into the patient portal, making appointments, searching for treatment information, or filling out online forms.

389. For example, the software code on the Google Analytics pixel that Defendants deployed contains a small library of functions, with an array of programable capabilities, which

allow companies like Defendants to do a variety of things. For example, one function of the Google Analytics Pixel is designed to capture data such as HTTP Headers and IP addresses, while a different function of the Google Analytics' Pixel is designed to capture button clicks and other patient communications with websites. These various functionalities perform independently of each other within the Google Analytics Pixel, operating as separate devices, which allow companies like Defendants to capture and share vast amounts of data about patients' activities and communications on its website, including such data as patients' communications, their geolocations, and their dialing, routing, addressing, and signaling information.

390. The trackers that Defendants deployed are a "device" or "process" as defined by CIPA. The role of these surreptitious trackers in collecting and transmitting IP addresses and other "addressing" information go well beyond the routine receipt of an IP address for loading a website, because the Google and Facebook trackers actually intercept, record, and transmit the IP addresses for purposes beyond their basic use related to a simple internet function. Instead, the IP addresses and other addressing data are shared with Google so that that those companies can identify individual patients, link their PHI to user accounts, and commercially exploit their PHI by selling targeted advertising.

391. The further transmission of Plaintiffs' and Class Members' IP addresses and other addressing information to third parties without their knowledge or consent (or a court order as required by § 683.51) constitutes an independent violation of CIPA.

392. Experity additionally assisted its healthcare clients like GoHealth by configuring the source code on its websites to permit clients to incorporate additional third-party trackers (including the Facebook Meta Pixel) for the purpose of surreptitiously sharing data with Facebook for marketing purposes, including patients' IP addresses, user agent data, browser configuration, and geolocation data.

393. Plaintiff and Class Members did not consent to the deployment or use of pen registers, including the Facebook Meta Pixel, Google Analytics on the Appointment Making Services provided via Experity's websites.

**COUNT VI**
**Breach of Implied-in-Fact Contract**
**Against Experity and GoHealth**
***(On Behalf of Plaintiffs and the California Class)***

394. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

395. Plaintiffs bring this claim on behalf of themselves and all California Class Members.

396. No express written contract exits between Plaintiffs and Class Members, on the one hand, and Experity or GoHealth on the other.

397. Under California law, an implied-in-fact contract comes into being when, notwithstanding the absence of a written agreement or verbal agreement expressing mutual obligations, the conduct or relations of the parties imply the existence of a contract. *Siskiyou Hosp., Inc. v. Cnty. of Siskiyou*, 109 Cal. App. 5th 14, 52, 330 Cal. Rptr. 3d 221, 253 (2025).

398. Defendants solicited and invited Plaintiffs and Class Members to provide their PHI via interactions with the Appointment Making Services as part of their regular business practices. Plaintiffs and Class Members accepted Defendants' offers and provided their PHI to Defendants as part of seeking medical services from their healthcare providers.

399. The very nature of the Appointment Making Services that Defendants offered patients evinced an implied promise by Defendants that Plaintiffs' and Class Members' PHI would be protected from unauthorized disclosures—not shared with Google, Facebook, and numerous other Third Parties for the purposes of exploiting that PHI.

400. By encouraging Plaintiffs and Class Members to share their PHI within the Appointment Making Services, Defendants' conduct manifested an implied promise to maintain the confidentiality of Plaintiffs' and Class Members' PHI.

401. In furnishing Defendants with their PHI via Appointment Making Services, Plaintiffs and Class Members entered into an implied-in-fact contract with Experity and GoHealth to retain and protect the privacy of their PHI from unauthorized disclosure to Third Parties such as Google.

402. Experity required and obtained Plaintiffs' and Class Members' PHI as part of its business associate relationship with their healthcare providers, evincing an implicit promise by Experity to act reasonably to protect the confidentiality of Plaintiffs' and Class Members' PHI.

403. GoHealth required and obtained Plaintiffs' and Class Members' PHI as part of its relationship with Plaintiffs and Class Members as a healthcare provider and covered entity under HIPAA.

404. Implied in the exchange was a promise by Defendants to ensure that the PHI of Plaintiffs and Class Members in their possession would only be used for medical treatment purposes and would not be shared with Third Parties such as Google without the knowledge or consent of Plaintiffs and Class Members.

405. By asking for and obtaining Plaintiffs' and Class Members' PHI, Defendants assented to protecting the confidentiality of that information. Defendants' implicit agreement to safeguard the confidentiality of Plaintiffs' and Class Members' PHI was necessary to effectuate the contract between the parties.

406. Plaintiffs and Class members provided their PHI in reliance on Defendants' implied-in-fact promise that this information would not be shared with Third Parties without their consent.

407. In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendants would comply with applicable laws and regulations governing the disclosure of such information and that Defendants would not allow Google, Facebook, and other Third Parties to collect and exploit their communications with Defendants without their consent.

408. It is clear by these exchanges that the parties intended to enter into an agreement and mutual assent occurred. Plaintiffs and Class Members would not have disclosed their PHI to Defendants but for the prospect of Defendants' implied promise to protect the confidentiality of their PHI.

409. Conversely, Defendants presumably would not have taken Plaintiffs and Class Members' PHI (much less offered the Appointment Making Services) if it did not intend to provide them with this benefit.

410. Defendants was therefore required to reasonably safeguard and protect the PHI of Plaintiffs and Class Members from unauthorized disclosure and/or use by Google, Facebook, and other Third Parties.

411. Plaintiffs and Class Members accepted Defendants' medical services offer and fully performed their obligations under the implied contract with Defendants by providing their PHI to Defendants.

412. Plaintiffs and Class Members would not have provided and entrusted their PHI to Defendants in the absence of their implied contracts with Defendants and would have instead retained the opportunity to control their PHI for uses other than the benefits offered by Defendants.

413. Plaintiffs and Class Members relied on Defendants' implied-in-fact promise to safeguard their PHI to their detriment.

414. Defendants breached the implied contracts with Plaintiffs and Class Members by failing to reasonably safeguard and protect Plaintiffs' and Class Members' PHI from disclosure to Google and other Third Parties.

415. Defendants' failure to implement adequate measures to protect the PHI of Plaintiffs and Class Members and Defendants' intentional disclosure of the same to Google, Facebook, and other Third Parties violated the purpose of the agreement between the parties: Plaintiffs' and Class Members' provision of PHIin exchange for medical services and other benefits.

416. Instead of safeguarding Plaintiffs' and Class Members' PHI, Defendants intentionally shared that information with Google, Facebook, and other Third Parties, thereby breaching the implied contracts it had with Plaintiffs and Class Members.

417. Plaintiffs and Class Members reasonably believed and expected that Defendants would operate the Appointment Making Services free of surreptitious collection and exploitation of patients' PHI. Defendants failed to do so.

418. Plaintiffs and Class Members would not have used the Appointment Making Services if they knew that Defendants would share their PHI with Google, Facebook, and other Third Parties without their knowledge or written consent.

419. Both the provision of medical services, including access to medical records, and the protection of Plaintiffs' and Class Members' PHI were material aspects of these implied-in-fact contracts.

420. A meeting of the minds occurred when Plaintiffs and the Class Members agreed to, and did, provide their PHI to Defendants and/or their affiliated healthcare providers via the Appointment Making Services.

421. Plaintiffs and the Class Members performed their obligations under the contract when they paid for their healthcare services and provided their PHI.

422. Plaintiffs and Class Members reasonably assumed that the monies being paid on their behalf to GoHealth and via their healthcare providers to Experity would be used, in part, to protect their PHI against unauthorized disclosure to Google, Facebook, and other Third Parties.

423. Defendants materially breached their contractual obligation to protect the nonpublic PHI that Defendants gathered when it allowed Google and other Third Parties to collect and exploit that information from the Appointment Making Services without Plaintiffs' and Class Members' consent.

424. Defendants also materially breached their implied-in-fact contractual obligation to protect Plaintiffs' and Class Members' non-public PHI when they failed to implement adequate security measures and policies to protect the confidentiality of that information. For example, on information and belief, Defendants (1) failed to implement internal policies and procedures prohibiting the disclosure of patients' PHI without consent to Third Party advertising companies like Google and Facebook, (2) failed to implement adequate reviews of the software code and JavaScript installed on its websites to ensure that patients' PHI was not being automatically routed without consent to Third Party advertising companies like Google and Facebook, (3) failed to provide adequate notice to the public that visitors to its websites risked having their PHI shared with Third Party advertising companies like Google and Facebook, (4) failed to take other industry standard privacy protection measures such as providing a "cookie" acceptance button on its website homepages, (5) failed to provide visitors to its websites with a means to opt out of the automatic transfer of data regarding their website interactions to Third Party advertising companies like

Google and Facebook, (6) failed to implement internal policies and educational programs to ensure that Defendants' website managers and coders were familiar with the legal regulations governing the disclosure patient PHI to Third Parties, and (7) failed to install adequate firewalls or take similar measures to prevent the automatic routing of patients' PHI to Third Party advertising companies like Google and Facebook.

425. As a result of Defendants' failure to fulfill the data privacy obligations it impliedly agreed to, Plaintiffs and Class members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of a diminished value compared to what they were entitled to.

426. The medical services that Defendants offer are available from other companies that do protect the confidentiality of patient communications.

427. Had Defendants disclosed that they would allow Google, Facebook, and other Third Parties to secretly collect Plaintiffs' and Class Members' PHI from the Appointment Making Services, neither the Plaintiffs, the Class Members, nor any reasonable person would used the Appointment Making Services provided by Defendants.

428. Defendants' conduct in sharing Plaintiffs' and Class Members' PHI with Google, Facebook, and other Third Parties diminished the sales value of that information. There is a robust market for the type of information that Plaintiffs and Class Members shared with Defendants (which Defendants then shared with Google, Facebook, and other Third Parties). Indeed, Google itself has offered to pay the public to acquire similar information in the past so that Google could use such information for marketing purposes. Plaintiffs and Class Members were harmed both by the dissemination of their PHI and by losing the sales value of that information.

429. As a direct and proximate result of these failures, Plaintiffs and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their PHI, the loss of control of their PHI, and the loss of the benefit of the bargain they had struck with Defendants.

430. Plaintiffs and the Class members are entitled to compensatory and consequential damages suffered as a result.

**COUNT VII**
**Unjust Enrichment**
**Against Experity and GoHealth**
***(On Behalf of Plaintiffs and the California Class)***

431. Plaintiffs plead this cause of action in the alternative to their claim for breach of implied in fact contract.

432. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

433. Plaintiffs bring this claim on behalf of themselves and all members of the California Class.

434. California law expressly recognizes that injured plaintiffs have a right to disgorgement of a defendant's profits in the absence of a cognizable economic loss.

435. Plaintiffs and Class Members conferred a benefit on Defendants in the form of valuable sensitive medical information that Defendants collected from Plaintiffs and Class Members under the guise of keeping this information private, and Defendants appreciated this benefit.

436. Defendants gained access to the PHI provided by Plaintiffs and Class Members by (1) knowingly concealing its use of Tracking Technologies from the public; (2) failing to provide industry standard privacy safeguards for its patients' PHI; (3) intentionally disregarding years of warnings from Google, HHS, and other public and private entities that it was obligated to protect its patients' PHI from unauthorized disclosures to Third Parties; and (4) intentionally violating California law.

437. Defendants benefited from the use of Plaintiffs' and Class Members' private communications and PHI and unjustly retained those benefits at their expense.

438. Defendants collected, used, and disclosed this information for their own gain, including for advertisement purposes, sale, or trade for valuable services from Third Parties. Specifically, Defendants bartered Plaintiffs' and Class Members' PHI to Google, Facebook, and other Third Parties in return for both advertising benefits and "free" website analytics information. What is more, by sharing patients' PHI with Google, Defendants gained the ability to utilize

Google's customized audiences and targeted advertising features, which saved Experity substantial revenues by making advertising far less expensive than it would have been otherwise. Experity also gained access to free website analytics data from Third Parties, which it otherwise would have had to spend substantial amounts of money to provide for itself.

439. Plaintiffs and Class Members would not have used Defendants' services if they had known that Defendants would collect, use, and disclose this information to Third Parties like Google.

440. Defendants exceeded any authorization given and instead consciously disclosed and used this information for its own gain, providing Defendants with economic, intangible, and other benefits, including substantial monetary compensation.

441. The Third Parties are not charities. Third Parties were willing to provide Defendants with "free" analytics benefits only because the PHI that Defendants surreptitiously shared with those Third Parties has an economic value many times in excess of the analytics services that the Third Parties provided Defendants.

442. Defendants' decision to intentionally mislead Plaintiffs and Class Members about its use of Tracking Technologies for its own financial benefit is a textbook example of an "unjust" enrichment.

443. Defendants unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendants' conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

444. Plaintiffs were aware of the economic value of their PHI and reasonably expected to be compensated by any party who shared or accessed their PHI to sell advertising. Plaintiffs and Class Members did not consent to Defendants giving their PHI away for free.

445. By engaging in the acts and failures to act described in this Complaint, Defendants have been knowingly enriched by the savings in costs that should have been reasonably expended to protect the PHI of the Plaintiffs and the Class.

446. Defendants were on notice that patients' PHI was protected by law; that patients' PHI had substantial monetary value; that cyber criminals and advertising companies were highly

desirous of obtaining access to its patients' PHI, yet failed to take reasonable steps to pay for the level of data security and privacy training that would have presented the unauthorized disclosure of patients' PHI to Google, Facebook, and other Third Parties.

447. The benefits that Defendants derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles for Defendants to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

448. Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

**COUNT VIII**
**Negligence**
**Against Experity and GoHealth**
***(On Behalf of Plaintiffs and the California Class)***

449. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

450. Plaintiffs bring this claim on behalf of themselves and all members of the California Class.

451. Upon accepting, storing, and controlling the PHI of Plaintiffs and Class Members, Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care to secure, safeguard, and protect their highly sensitive PHI.

452. Defendants breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiffs and Class Members' PHI from unauthorized disclosure.

453. It was reasonably foreseeable that Defendants' failures to exercise reasonable care in safeguarding and protecting Plaintiffs and Class Members' PHI through the Tracking Technologies would result in unauthorized Third Parties gaining access to such PHI for no lawful purpose.

454. Defendants' duty of care to use reasonable measures to secure and safeguard Plaintiffs' and Class Members' PHI arose due to the special relationship between Defendants and

patients, which is recognized by statute, regulations, industry ethical rules (including the AMA rules described above), and the common law.

455. In addition, Defendants had a duty under state and federal privacy laws, which the state legislature and Congress enacted to protect the confidentiality of patients' healthcare information, set strict conditions under which providers may use such information, and limit to whom providers can disclose such information.

456. Defendants' conduct also created a foreseeable risk of harm to Plaintiffs and Class Members and their PHI. Defendants' misconduct included the failure to (i) secure Plaintiffs and Class Members' PHI; (ii) comply with industry-standard data security practices; (iii) implement adequate website and event monitoring; and (iv) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of Tracking Technologies.

457. Defendants' wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiffs' and Class Members' PHI constituted negligence at common law.

458. Accordingly, Plaintiffs, individually and on behalf all Class Members, seek compensatory damages (including damages to compensate for the injuries above), plus costs and attorneys' fees.

**COUNT IX**
**Negligence Against Experity**
***(On behalf of Plaintiffs and the Illinois Class)***

459. Plaintiffs individually and on behalf of the Nationwide Class repeat and reallege the foregoing paragraphs as if fully alleged herein.

460. Under Illinois law, to state a negligence claim a plaintiff must plead that the defendant owed a duty of care to the plaintiff, that the defendant breached that duty, and that the breach was the proximate cause of the plaintiff's injuries." *Cowper v. Nyberg*, 28 N.E.3d 768, 772 (Ill. 2015).

461. Illinois law recognizes that companies like Expeirty who handle, collect, and otherwise manage non-public health information owe a duty to prevent the unauthorized disclosure of patients' health information. *Mayer v. Midwest Physician Admin. Servs., LLC*, No. 23-CV-3132, 2025 WL 963779, at *5 (N.D. Ill. Mar. 31, 2025)

462. It was foreseeable to Experity that deploying Google Analytics on its Patient Portals and Mobile Application would result in the patients' PHI being shared with Google. By deploying Google Analytics inside its Appointment Making Services, Experity acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs and the Class Members' PHI.

463. Experity also had a duty to notify Plaintiff and Class Members within a reasonable a reasonable time frame of any breach to the confidentiality and security of their PHI. This duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect the confidentiality of their PHI and to mitigate the harm caused by Experity's conveyance of their PHI to Google.

464. Experity owed these duties to Plaintiffs and the Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Experity knew or should have known would suffer injury-in-fact from Experity's deployment of Google Analytics inside its Appointemnt Making Services.

465. The risk that Google would access, exploit, and misuse Plaintiffs' and Class Members' PHI was foreseeable. Given that Experity receives vast amounts of PHI, and that Google warns health care systems not to share health data with it via Google Analytics, Experity was on notice of the need to protect Plaintiffs' and Class Members' PHI from unauthorized disclosures via analytics technologies.

466. PHI is highly valuable, and Experity knew or should have known the risks in obtaining, storing, handling, transmitting, and using Plaintiffs' and Class Members' PHI, and the importance of exercising reasonable care in the handling and protection of Plaintiffs' and Class Members' PHI.

467. Experity breached its duty of reasonable care to Plaintiffs and Class Members in deploying Google Analytics on its Appointemnt Making Services and by failing to supervise its employees, agents, contractors, and vendors in the acquisition, handling, and securing of the Plaintiffs' and Class Members' PHI. Experity further breached its duty of reasonable care to Plaintiffs and Class Members by sharing their PHI with Google, which actually and proximately caused injuries to Plaintiffs and the Class Members.

468. Experity also breached its duty of care by failing to provide reasonable and timely notice to Plaintiffs and the Class Members that their PHI had been shared with Google, which actually and proximately caused additional injuries to Plaintiffs and the Class Members.

469. As a direct and traceable result of Experity's negligence, Plaintiffs and Class Members have suffered damages, including monetary damages, increased risk of future harm, loss of privacy, and fear, anxiety, and worry about their loss of control over their PHI.

470. Experity's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs' and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation, the improper disclosure of PHI, lost value of their PHI, and lost time and money incurred to mitigate this improper disclosure that resulted from and were caused by Experity's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

471. But for Experity's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured. These injuries were the reasonably foreseeable result of Defendant's breach of its duties. Experity knew or should have know that it was failing to meet its duties and that its breach would cause Plaintiff and Class Members to suffer the foreseeable harm associated with the exposure of their PHI.

472. A data broker is a company that collects personal information from various sources, including online activities, and sells it to other businesses. These businesses then use this information for marketing, risk assessment, insurance pricing, and other purposes. Data brokers often operate effectively anonymously because they do not have direct contact with consumers. As a result, the vast majority of consumers are not even aware that their personal data is being sold and re-sold.

473. As a consequence of Defendant's negligence, Plaintiffs and Class Members have been harmed by losing control over their own PHI, which has now been shared with Google, with advertisers, and with online data brokers who buy, sell, and resell this information. The only way for Plaintiffs and Class Members to claw back the privacy of their PHI is to pay a data broker opt service to go out into the marketplace and remove their PHI from data broker rolls. Such data

broker opt out services are offered by a variety of companies including DeleteMe, CyEx, and Optery for prices that range from $100 to $300 a year. Without hiring one of these data broker opt out services, however, Plaintiffs and Class Members have no way of recovering their privacy because Experity itself has no control over their PHI once Experity shared that data with Google.

474. Had Plaintiffs and Class Members known that Experity would not adequately protect their PHI, Plaintiffs and Class Members would not have entrusted Defendant with their PHI.

475. Plaintiffs and Class members had a legitimate and reasonable expectation of privacy with respect to their PHI and were accordingly entitled to protection of this PHI against the acquisition and disclosure of their PHI by unreasonable means.

476. Experity had notice and knew that its deployment of Google Analytics on its Appointemnt Making Services, where Plaintiffs and Class Members shared their PHI, would cause injury to Plaintiffs and Class Members. Experity, like other healthcare providers, had notice from Google that it was improper to deploy Google Analytics on healthcare website but did so anyway because it valued profits more than patients' privacy. Experity's conduct is reprehensible because it deployed Google Analytics technology knowing that this technology would share patient data with Google from inside its Appointemnt Making Services, but nevertheless did it anyway—regardless of the consequences for the thousands of patients who trusted Experity to safeguard their most sensitive health information.

477. As a proximate result of Experity's acts and omissions, Plaintiffs' and Class Members' PHI was subject to intrusion, causing Plaintiffs and Class Members to suffer injury, including, at minimum, the following damages:

a. General damages for invasion of their privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm;

b. Plaintiffs and Class Members cannot remediate the privacy harms they have suffered without spending hundreds of dollars a year to pay for third-party services to scrub their PHI from data broker rolls;

c. Sensitive and confidential information including patient status and appointments that Plaintiffs and Class Members intended to remain private is no longer private;

d. Experity eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

e. Experity took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit; and

478. The harm being suffered by Plaintiffs and Class Members is ongoing because—as of the time of the filing of this complaint—Experity continues to permit the deployment of Google Analytics on the Appointment Making Services it offers the public.

479. Plaintiffs and Class Members have no adequate remedy at law for the injuries that they have suffered (and will continue to suffer) because of Experity's wrongful practices in that a judgment for money damages will not end the invasion of privacy for Plaintiffs and Class Members. Accordingly, Plaintiffs and Class Members seek such injunctive relief as the Court deems legal, equitable, and proper.

**COUNT X**
**Violation of 18 U.S.C. § 2512**
**Manufacture, Distribution, Possession, and Advertising of Wire, Oral or Electronic Communicaitons Intercepting Devices Prohibited**
**Against Experity**
***(On Behalf of Plaintiffs and the Nationwide Class)***

480. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

481. The United States Code, 18 U.S.C. §2512(1) "Manufacture, distribution, possession, and advertising of wire, oral, or electronic communication intercepting devices prohibited," states:

> Except as otherwise specifically provided in this chapter, any person who intentionally –sends through the mail or sends or carries in interstate or foreign commerce, any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications; manufactures, assembles, possesses, or sells any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it

> primarily useful for the purpose of the surreptitious interception of wire, oral or electronic communications, and that such device or any component thereof has been or will be sent through the mail or transported in interests or foreign commerce; or places in any newspaper, magazine, handbill or other publication or disseminates by electronic means and advertisement of any electronic, mechanical, or other device knowing the content of the advertisement and knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire, oral or electronic communications; or any other electronic or mechanical, or other device, where such advertisement promotes the use of such device for the purpose of the surreptitious interception of wire, oral, or electronic communications, knowing the content of the advertisement and knowing or having reason to know that such advertisement will be sent through mail or transported in interstate or foreign commerce, Shall be fined under this title or imprisoned not more than five years, or both. 18 U.S.C. §2512(1)

482. All of the Appointment Making Services websites are hosted on servers operated and matianed by Experity.

483. Experity "possessed" and "marketed" surrepsitious tracking technologies, including Google Analytics, which it encouraged and assisted its healthcare clients, including GoHealth, in deploying on the Appointment Making Serivces. These surrespitious tracking technologies silently gathered, stored, transferred, and rerouted PHI and PII belonging to Plaintiffs and Class Members, as described herein.

484. At the time the Tracking Technologies were illegally used, Experity knew that the design of the Tracking Technologies rendered them primarily useful for the purpose of the surreptitious interception of wire, oral or electronic communications, and that such intercepted communications would be sent through the mail, internet, or transported in interests or foreign commerce, all in violation of 18 U.S.C. §2512(1). For example, Experity knew that Google Analytics was expressly designed to intercept and disclose electronic communications to Google.

485. Experity violated 18 U.S.C. §2512(1) when it actively distributed the Tracking Technologies to its healthcare clients, actively encouraged its clients to deploy those Tracking Technologies on the Appointment Making Services, actively provided guidance to clients on how they could deploy and exploit Tracking Technologies on the Appointment Making Services, and actively designed the Appointment Making Services so that clients could easily deploy Tracking Technologies within Google Tag Manager code on Experity's Appointment Making websites.

486. Experity possessed, marketed, and activetly operated the violative Tracking Technologies, which were hosted on servers operated and maintained by Experity. Experity intentionally designed its Appointment Making Services websites so that clients could deploy Tracking Technologies inside Google Tag Manger code silos on Experity's websites. Experity did this knowing that these Tracking Technologies—including Google Analytics and Google Tag Manager—would be primarily used for the surrepitous interception and disclosure of Plaintiffs' and Class Members' electronic communications.

487. 18 U.S.C. §2520 allows Plaintiffs a private cause of action for the violation of 28 U.S.C. §2512. Further, 18 U.S.C. §2520(c)(2) authorizes damages as follows: In any other action under this section, the court may assess as damages whichever is the greater of - the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000.

488. Plaintiffs have suffered emotional as well as actual damages because of Experity's distribution and/or advertising of the Appointment Making Services, which surreptitiously intercept wire, oral or electronic communications. Alternatively, Plaintiffs are entitled to statutory damages. Further, 18 U.S.C. §2520(b) allows for recovery of punitive damages, attorneys' fees, and other litigation costs.

## DEMAND FOR JURY TRIAL

489. Plaintiffs hereby demand a trial by jury on all issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class Members, respectfully request relief against Defendants as set forth below:

a. Certifying the Class and appointing Plaintiffs as the Classes' representative;

b. Finding that Defendants' conduct as alleged herein was unlawful;

c. Awarding such injunctive and other equitable relief as the Court deems just and proper, including, but not limited to, enjoining Defendants from making any further disclosure of Plaintiffs and Class Members' communications to Third Parties without the Plaintiffs and Class Members' express, informed, and written

consent; requiring Defendants to implement adequate procedures for ensuring the confidentiality of patients' HPI; mandating that Defendants hire third-party monitors for a period of at least three years to ensure that the these steps have been taken; and mandating that Defendants provide written verifications on a quarterly basis to the court and counsel for Plaintiffs and Class Members in the form of a declaration under oath that the above steps;

d. Awarding statutory damages of $5,000 per violation for Defendants' violation of the Electronic Communications Privacy Act;

e. Imposing a constructive trust against Defendants through which Plaintiffs and Class Members can be compensated for any unjust enrichment gained by Defendants;

f. Awarding Plaintiffs and Class Members statutory, actual, compensatory, consequential, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

g. Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law;

h. Awarding Plaintiffs and Class Members reasonable attorney's fees, costs, and expenses;

i. Awarding costs of suit; and

j. Such other and further relief to which Plaintiffs and Class Members may be entitled.

Dated: March 26, 2026

Respectfully submitted,

*<u>/s/ Matthew J. Langley</u>*
Matthew J. Langley (SBN 342846)
Christopher M. Nienhaus*
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, IL 60614
Tel: (773) 554-9354
matt@almeidalawgroup.com
chris@almeidalawgroup.com

Foster C. Johnson (SBN 289055)
Joeseph Ahmad*
Mark Holden*
**AHMAD, ZAVITSANOS & MENSING, PLLC**
1221 McKinney Street, Suite 2500
Houston TX 77010
Tel: (713) 655-1101
Fax: (713) 655-0062
fjohnson@azalaw.com
joeahmad@azalaw.com
mholden@azalaw.com

*Counsel For Plaintiffs, Individually And On Behalf Of All Others Similary Situated*

* *Pro Hac Vice Pending*